WILLIAM G. PONDER, EXECUTOR OF ARCHIBALD GRAHAM, APPEL-
LANT, v. MARY GRAHAM, APPELLEE.

As respects third persons, a man who lives with a woman, and holds her out as
his wife, is estopped from denying it, when charged with liabilities as her
husband, but such recognition cannot affect the rights of property even as
between themselves.

The executor of a person who has recognized a woman as his wife, is not estop-
ped from setting up and asserting the illegality of the marriage, where it
was absolutely void, as where there existed a civil disability to contract mar-
riage. The marriage being void, no civil rights can be acquired under it,
and it is competent for the executor, representing the interests of distribu-
tees and creditors, to impeach its validity.

The act of Congress, approved March 30th, 1822, by which the Territorial Gov-
ernment of Florida was organized, and the several acts amendatory there-
of, are to be regarded as the Constitution of the Territory, differing, how-
ever, from the Constitutions of the State Governments in this—that the
former contain *grants* of power, while the latter are restrictions of power
primarily possessed.

By the organic law, the judicial power of the Territory was vested in two Supe-
rior Courts, &c., and the legislative power in a Governor and Council, and
this power was to extend to " all rightful subjects of legislation."

An act of the Legislature which undertakes to determine questions of fact and
law, affecting the rights of persons, or of property, is judicial in its charac-
ter, and is not, therefore, a rightful subject of legislation. And though the
facts and reasons alleged in an act of divorce are such as, by law, would
warrant the sentence or decree, yet the inquiry into those facts and reasons,
is judicial in its nature, and the determination upon them is a judicial act.

The act of the Legislative Council, passed in 1828, gives to the Courts jurisdic-
tion in cases of divorce.

The Legislative Council had no power or authority, after the act of 1828, to take
jurisdiction of, and decide questions of divorce, and to pass an act dissol-
ving the marriage contract between two persons, lawfully made and entered
into—nor was the power or authority possessed by the Legislative body
either before or after said act.

Marriage is a contract, in the strict, legal definition of the term, and a law dissolving the marriage relation, impairs the obligation of the contract, and is in conflict with the Constitution of the United States, and is, therefore void.

Appeal from judgment of the Circuit Court of the County of Leon, rendered at the Spring term, 1850, the Honorable THOMAS BALTZELL, Judge, presiding.

Mary Graham filed her petition in the Circuit Court of the County of Leon, representing that her husband, Archibald Graham, died on or about the 2d January, 1848, after having in his life time made and executed his last will and testament—that said will and testament bears date 16th November, 1847, and that one John R. Cannon, and the defendant, William G. Ponder, were therein named and appointed executors—that defendant alone qualified and took out letters testamentary—that the provision made in the said will is not satisfactory to petitioner, and that she, in due form, and in proper manner, signified her dissent thereto, within the time limited by law. The petitioner further states, that her deceased husband died seized and possessed of a large estate, real, personal, and mixed—out of which, petitioner prays that dower may be allotted to her, under the law in in such case made and provided.

The defendant for answer, or plea to said petition, alleged that the said Mary Graham ought not to have her dower, as in her petition she claimed and prayed, because the said Mary never was *accoupled* to the said Archibald Graham, deceased, in lawful matrimony. To this plea, there was a replication, affirming that petitioner was *accoupled* in lawful matrimony with the said Archibald Graham, and issue thereon. The jury found for the petitioner; and thereupon it was adjudged and ordered, that said petitioner is entitled to an assignment of dower, and a writ of dower issued as prayed for, commanding the sheriff to summon five discreet free holders as commissioners, to allot and set off, by

metes and bounds, to Mary Graham, widow of Archibald Graham, one-third part, according to quantity and quality of the real estate of which the said Archibald died seized, whereof the said Mary had not relinquished her right of dower, and at the same time to allot and set off to the said widow her portion, or one-half of the personal estate of the deceased.

The commissioners summoned by the sheriff made their report, August 8th, 1850, which was confirmed—but to which the counsel for appellant excepted, for the reason that the " said commissioners have assigned, allotted and set apart to the said Mary, one-half part of the gross amount of the personalty, without having first deducted therefrom the amount of debts due by said decedent at the time of his death—this exceptant contending, that the widow of one deceased is only entitled to a share of the nett personal estate, deducting all debts and charges upon the same, at the time of the death of decedent, and the expenses of administration"— which exception was, however, overruled by the Court.

The facts of the case are succinctly these: The respondent, then Mary Buccles, about the year 1820, in South Carolina, intermarried with one Solomon Canady. Some time afterwards, they removed to, and resided in, Georgia, but soon, in consequence of domestic dissentions, separated.— Mary went to reside with Graham, a bachelor, and continued to live with him, under circumstances from which an adulterous cohabitation might be inferred.

In 1832, and while the said cohabitation continued, a bill was passed by the Legislative Council of the then Territory of Florida, entitled " An act for the relief of Mary Canady."

By this act, the Legislative Council, for the cause expressed in the preamble, assumed to judge and declare that the said Mary Graham was thereby divorced from her said husband, Solomon, and that the bonds of matrimony subsisting between them, were thereby to be entirely and abso-

lutely dissolved, as if the same had never been solemnized. (See pamphlet acts of 1832, page 123.) There does not appear to have been any petition, affidavit, or proofs—a reference to a committee to ascertain the facts, or any notice to the absent husband. In 1834, the cohabitation between Mary and the testator still subsisting, the ceremony of marriage is celebrated between them, and from this time up to the period of the testator's death, which occurred in 1848, he lived with her, and acknowledged her as his wife, and in his will he provides for her by that name, and in that relation.

On the trial of the case in the Court below, defendant's counsel prayed the Court to instruct the jury as follows, viz :

1. That the Legislative Council of the Territory of Florida had no power or authority to take jurisdiction of and decide questions of divorce, and to pass an act dissolving the marriage contract between two persons, lawfully entered into between them ; and that, therefore, the act of the Governor and Legislative Council of the Territory of Florida, entitled An act for the relief of Mary Canady, passed February 9th, 1832, rejected February 10th, 1832, and reconsidered and passed by the requisite majority, February 11th, 1832, is void and of no effect.

2. That it is incumbent on the party claiming the benefit of the said act, to show that the other party, to wit, Solomon Canady, had notice of the said proceedings before the Legislative Council, and had an opportunity to appear before it, and cross-examine the witnesses—introduce evidence in his favor, and make defence to the said complaint ; and that in the absence of such proof, especially if the jury believe from the evidence that Solomon Canady was not a resident of the Territory of Florida, the said act is to be disregarded, as invalid.

3. That all judgments rendered any where against a par-

ty who had no notice of the proceeding, are rendered in violation of the first principles of justice, and are null and void—which instructions so prayed, numbered one, two and three, the Court refused to give to the jury.

The Court then gave the following instructions:

1. That the marriage of Graham with the petitioner is legal and valid, unless the act of the Legislative Council of 1832 was against the provisions of the organic law, so as to make it void.

2. That *prima facie*, the action of the Legislature is to be regarded as valid, and it lies upon the party contesting it to maintain its invalidity, by showing that it was passed under circumstances not justified by the constitution and laws then existing.

3. If you shall be of opinion that the marriage contract between Canady and his wife was in full force and operation, securing to each the rights and privileges inherent to such relation, so that the contract was not abrogated and annulled, but operative and in force, and especially that the same was in full force, so far as the husband was concerned—then it was not competent for the Territorial Legislature to declare a divorce between the said parties, and such action was illegal and void, as impairing the obligation of the contract.

4. That if a party has, beyond all question, impaired and broken the marriage contract, so that its existence as a contract may no longer, with propriety, be asserted—that the clause of the Constitution of the United States, providing that no State shall pass a law impairing the obligation of a contract, is not affected by the action of a Legislature declaring a divorce, and allowing a new marriage.

5. If you shall be of opinion that the husband had violated the contract, and in fact impaired its main provisions and constituent elements, by deserting his wife, withdrawing from her society, refusing to her a suitable maintenance

and support, and by other acts and conduct impairing, repudiating and rejecting his contract, so that it could not in fact be regarded as a subsisting contract—that then it was competent for the Legislature to declare the same, and to give her the privilege of forming another contract, by contracting a new marriage. To which instructions, the counsel for defendant excepted.

The errors assigned in this Court are—

1st. The Court below erred in the instructions given to the jury, as set forth in the bill of exceptions.

2d. The Court erred in refusing to instruct the jury, as prayed for by appellant.

3d. The Court erred in overruling the exception of appellant to the report of the sheriff and commissioners.

The case was very elaborately argued by ARCHER for Appellant, and by RANDALL and WOODWARD for Respondent.

Judge BAKER, of the Middle Circuit, sat with the Chief Justice, and SEMMES, Justice, at the hearing of this cause, THOMPSON, Justice, being disqualified, by reason of his having been of counsel in the Court below.

SEMMES, *Justice*, delivered the opinion of the Court.

This cause comes before this Court on appeal from Leon Circuit Court. The suit was commenced in the Court below by the respondent, representing herself as the widow of the testator, Archibald Graham, and praying for an allotment of dower in the estate of her deceased husband. The appellant filed his plea, " *ne unques accouple en loyal màtrimonie,*"—to which, there was a general replication of valid marriage. On the trial of the cause, the Judge in the Court below gave to the jury several instructions, which were excepted to by counsel for appellant. Other instructions were asked for by the same counsel, which were refused, and which refusal was also excepted to.

In considering this case, it is unnecessary to notice the instructions given by the Court on the trial.   Passing by these, I proceed to the consideration of the first instruction asked by appellant, and refused.   That instruction in substance is this : That the Legislative Council of the Territory of Florida had no power or authority to take jurisdiction of and decide questions of divorce, and to pass an act dissolving the marriage contract between two persons, lawfully entered into between them ; and that, therefore, the act of the Legislature divorcing Mary Canady, passed February 11th, 1832, is void and of no effect.

In considering the important questions which arise under this instruction, and to which the attention of counsel was mainly directed, I frankly confess in the outset my unqualified concurrence in the doctrine, as laid down by the Court in the case of The State v. Cooper—that it is the duty of a Court to sustain the validity of a statute, unless its unconstitutionality is so obvious as to admit of no doubt.   5 Blackford's Reports, 259.   On the other hand, it must be conceded, that, however grave and interesting the questions presented for the determination of a Court, it is its duty to shrink from no responsibility imposed upon it by the laws and the constitution.

A question has been raised by the counsel for respondent, which it is necessary first to dispose of.   It is insisted that, inasmuch as Graham by his will recognizes respondent as his wife, his executor is estopped from setting up the illegality of the marriage, and that by his probate of the will, he is bound to execute it.   I do not understand that the executor is seeking to avoid the execution of this will, by depriving respondent of the benefit of its provisions, as one of the *legatees*.   But, on the contrary, she has renounced the provision in her favor, and claims dower, as the widow of Graham, adversely to the will.   The doctrine of estoppel has no application to this case.   It is not denied that, as respects

third persons, a man who lives with a woman, and holds her out as his wife, is estopped from denying it, when charged with liabilities as her husband, but it cannot affect the rights of property even as between themselves. 5 Iredell's Reports, 495.

The objection, I apprehend, arises from not considering the distinction between void and voidable marriages. Whenever any of the canonical disabilities exist, the marriage is not *ipso facto* void, but is esteemed both by the canon and common law valid for all civil purposes, until sentence of nullity is pronounced by the spiritual court, which can only be done in the life-time of the parties ; and in the event of either of the parties dying before the Ecclesiastical Court proceeds against them, the marriage becomes good, *ab initio*, to all intents, and the wife and husband may have dower and *curtesy*, and the issue will be legitimate. Coke on Littleton, 32, 33. But where any civil disability, as prior marriage, exists, the marriage is void absolutely, and no civil rights can be acquired under it ; and it may be inquired of in any Court where rights are asserted under it, though the parties be dead. 5 Iredell's Reports, 493–4.

Where any civil disability exists, the judgment of the Court is but declaratory; it does not make it void; for though a marriage *de facto*, it had no legal existence. It is competent for a party to set up the nullity of his first marriage, in bar of a sentence praying the nullity of the second marriage. Shelford, 332. Either of the parties to a marriage, or the parent or guardian of either of the parties, or any other person interested, may apply to the Court, and they have a right to a declaratory sentence, and it is upon the ground that the public, as well as the parties in interest, have a right to know the real character of these domestic relations. Shelford, 334. It is, therefore, upon principle and authority, competent for the executor, representing as he does the interest of distributees and creditors of this estate, to impeach the validity of this marriage.

The main question raised in this case, as to the power of a Legislative body, *as such*, to grant divorces, is not altogether a new one. It has been investigated by some of the American Courts, and grave constitutional questions have been necessarily involved in the discussion ; and yet the question still remains an open one—opinions clashing—nothing settled. It is to be regretted that amid this conflict of opinion, upon a question of such deep interest, we are unable to avail ourselves of the investigation of any one of the great jurists of our country, to relieve the subject from embarrassment and difficulty, and that while almost every other legal question of importance has had light and authority imparted to it, this, one of the most important of all, has been allowed to slumber on in doubt and uncertainty.

The Legislatures of some of the States of the Union exercise exclusive jurisdiction over this subiect ; one or more of them by reason, as is contended for by their Courts, of the absence of any constitutional inhibition—while others claim this authority by reason, it is said, of an inherent power, analogous to that of the Parliament of Great Britain. Some exercise the power as a constitutional right, while others claim it as an original right, and without the sanction of constitutional authority.

No one doubts the right of the people by their constitution, to invest this power in the Legislature, or any where else ; but the question is, when the constitution is silent on the subject, in what department of government does this authority rest ? I believe that much, if not the whole difficulty, has arisen from overlooking some of the great principles wich enter into the constitutional government of the States, and from not preserving the obvious distinction between legislative and judicial functions—by confounding the *right* which a legislative body has to pass *general laws* on the subject of divorce, with the *power* of dissolving the marriage *contract*.

There is an important and well recognized distinction between the powers of the Federal and State Governments. The former was created by the States directly, not by the people ; designed not as a government for the people, but of the States ; with authority to legislate on questions of national policy in which the States, as sovereign communities, had and felt a national interest ; in short, to represent, by its action, the united will of these distinct sovereignties.　The domestic relations, and all questions affecting our civil institutions, remained where they were—with the *people* of the respective States.　The powers of the General Government are, therefore, purely derivative.　The constitution is a mere delegation of power, and as a consequence, Congress can exercise none not expressly given, or which does not arise by necessary implication.　The *limitation* of power contained in that instrument is, necessarily, applicable to the government created by the instrument itself.　All power, therefore, not delegated by that instrument, or inhibited to the States, is reserved to the latter.— On the other hand, the legislature of a State, aside from any constitutional restriction, possesses the law-making power, and is undoubtedly vested with all the legislative powers possessed by the people themselves, and may exercise the same in any manner consistent with the great and fundamental principles of natural justice.

The people, in organizing their respective State Governments, never contemplated, by their several constitutions, a *grant* of power, but a *limitation* of *inherent* power in the legislature, their legally constituted delegates.　See Smith on the Constitution, and Story on the Constitution.

The legislative department, unless restricted by constitutional provisions, possesses every power not delegated to some other department ; although as to other departments, it is in the nature of a *general grant* of *powers*.　2 Scammon's Reports, 81.

These general principles will be found not without their application to the case before us, and especially to the decisions of some of the State Courts on this subject, which I will hereafter notice.

The Territorial Government of Florida was organized by act of Congress, approved 30th March, 1822. For several years subsequent, Congress passed several acts amendatory of this, but not altering any of its essential provisions. This government was formed under that clause of the Constitution of the United States, which vests in Congress the power "to *dispose* of, and make all needful rules and regulations respecting the territory, or other *property* belonging to the United States." It is a question by no means free from doubt, whether it ever was contemplated by the use of these words, to vest in Congress the power to establish separate and distinct Territorial Governments. Be this as it may, the exercise of the power has been acquiesced in, and I know of no useful purpose to be gained by calling it in question.

The act of Congress above referred to, being the organic law, is to be regarded, as it is in point of fact, the Constitution of the Territory. This organic law, unlike the constitutions of the States, is a *grant*, and not a *restriction* of power primarily possessed, and in this respect, similar to the Constitution of the Federal Government. The Territorial Government being the creature of Congress, derives all its powers from this charter, giving it a political existence. It is to this grant, that we are mainly to look for a solution of the question before us—all powers not enumeted, or arising by implication, are reserved, and this is the correct rule in the construction of this grant. See 3 Story on Constitution, 133. The act provides that " the *judicial* power of the Territory shall be vested in two Superior Courts," &c. The legislative power shall be vested in the *Governor and Council*, and " shall extend to *all rightful sub-*

*jects of legislation."* The question here arises, was the act of the Legislative Council, in 1832, divorcing the respondent from her husband, Solomon Canady, a *legislative* or *judicial* act ? What are we to understand by rightful subjects of legislation ?

It is insisted in argument, that a legislature possesses *inherent* power, over and above that of making laws. If this were true, then the terms, *" rightful subjects,"* are a *restriction* imposed by Congress on the grant itself, confining the action of the Council to such matters as legitimately attach, and from necessity belong, to the law-making power. But the proposition is not true. The legislature and the law-making power are convertible terms, and the one has no greater or less import than the other. No legislature, as such, has any other power than that of making laws. Its *inherent* authority does not extend beyond this. Were those restrictive words erased from the grant, I know of no rule of construction which would, under the general terms, " legislative powers," vest in the Council any other power than that of enacting laws and special acts, which confer *privileges* without invading rights, (of course, excepting rules for its own government.) But from the plain and obvious import of the terms used in the grant, I believe it the only sound and consistent interpretation which the act is susceptible of.

It is said that this act of the Legislative Council was a *law*, and, consequently, was a legitimate exercise of power. If this were true, it was competent for the legislature to repeal it ; for all laws can be repealed, (except where vested rights are created.) And it would scarcely be contended that any legislative body could dissolve the contract one day, and restore it the next. But the act was not a law in any sense. The term is defined by all legal writers to be a rule of civil conduct, prescribed for the *future* actions of men—from its very nature, it must be *prospective*, otherwise it can-

not be a rule of civil conduct, but partaking of a judicial proceeding, as contra-distinguished from a legislative power. It is said by an eminent jurist, " that the very essence of a law is a rule for future cases."  · It must be of general and uniform application.   If an act of the legislature, in terms, judicially determines a question of right, or of property, as the basis upon which the act is founded, so far the proceeding must be regarded as *judicial.*  Smith on the Constitution, § 347 ; or where the act determines matters of fact, or of right, dependent on matters of fact, it is the exercise of *judicial* powers.  Smith on the Constitution, § 351.

An act which is limited in its operation, and which exhausts itself upon a particular person, or his rights, is, in its very spirit and terms, a judicial proceeding.   9th Gill and Johnson, 365.

The judicial power of a State is that which administers justice, under the sanction and according to the forms of law.   When speaking of the legislative and judicial departments of a government, our meaning is well defined and comprehensive—why should it be less so, when referring to their respective powers ?

The act of the Council undertakes to determine questions of fact and law exclusively within the province of the Courts.   If, as is contended with much reason, there were no existing causes of divorce, as set forth in the preamble to this act, then the dissolution of the marriage contract was a mere assumption of power, exercised in the most arbitrary manner.

An act declaring that to be a crime which, by the laws of the land, was no crime, and punishing an innocent party, by depriving him of important legal rights without a hearing, without notice, and who had not, in any mode, made himself amenable to our laws, such proceeding could not be justified, on any principle of natural right, or common justice.   But assuming the fact to be so—that the grounds

on which the legislature acted were recognized by our law as causes for divorce—then the legislature, assuming the high prerogatives and character of a judicial tribunal, proceeds to determine the facts, and administer the law—upon *ex parte* showing, pronounces judgment against an absent defendant, and declares a forfeiture of his marital rights, for causes happening in a foreign jurisdiction, and to whose laws he was alone amenable. Is there no distinction between making a law, and expounding and administering a law ? Between declaring that certain acts may work a forfeiture, and passing judgment of forfeiture ? Between enacting a law affecting the remedy, and pronouncing a judgment dissolving the contract ? Had any Court dissolved this marriage contract, with the facts before it disclosed in this record, it would have been but a poor compliment to its own sense of justice, or the high and solemn trust with which the law had clothed it.

Chancellor Kent (2d Commentaries, 106,) says, the question of divorce involves investigations which are of a *judicial* nature, and the jurisdiction over the subject ought to be confined to judicial tribunals. If the question of divorce be a rightful subject of legislation, then it is very clear that it is an improper subject for judicial cognizance, unless it can be shown that the right of the Courts to legislate, is co-extensive with that of the legislature to administer *the laws*. And if the Courts have no jurisdiction, of what avail is that political maxim which we find engrafted in our declaration of rights, and which exists above and independent of all constitutions—"that the Courts of the country shall be open to every citizen for the redress of his wrongs, and enforcement of his rights ?"

In this country, at least, no man can be compelled to surrender his rights, except by due course and process of law, administered by the Courts.

The case reported in 4th Condensed Supreme Court Re-

ports, 520, decided by Chief Justice Marshall, has been referred to, and the *dictum* of this great jurist has been invoked by counsel for respondent, as an authority in support of their position.    Did I believe his language susceptible of the construction given it, I would more than doubt my own convictions on this subject.    The Chief Justice says—" It never has been understood to restrict the *general* right of the legislature to *legislate on* the *subject* of divorces.   *Those* acts *enable some tribunal*, not to impair the contract, but to liberate one of the parties," &c.    Mr. Justice Story in the same case says—" A *general law regulating* divorces, *like a law regulating remedies* in *other cases* of breaches of contract," &c., and he further adds, " that he was not prepared to admit a power in the State legislatures to dissolve the marriage contract," &c., " without a judicial inquiry to ascertain the breach of the contract."    Chancellor Kent, (2d Commentaries, 89, 90,) in commenting on the above case, fully recognizes the general right of a legislature to pass *laws* on the *subject* of divorce, and so far as I am aware, the exercise of this power has never been questioned by any legal writer.

It is said, and the doctrine is broadly intimated in several of the authorities, that a legislature in this country can grant divorces, in analogy to the Parliament of England. I can see no parallel in the two cases.    Political writers in England claim for their Parliament omnipotent power.    It is said that in that country " there is no written constitution, no fundamental law, nothing visible, nothing tangible, nothing real, nothing certain, by which a statute of Parliament can be tested."    See 3 Dallas's Reports, 308 ; and yet, with all this acknowledged and untrammelled power, it does not assert or exercise the right of dissolving the marriage contract, to the extent and in the summary mode adopted by the Legislatures of some of the States.

Parliament never decrees a divorce, *a mensa et thoro*—

that power belongs exclusively to the Courts.   Parliament never even decrees a divorce *a vinculo*, but for adultery, and that upon a judgment *a mensa et thoro*, first pronounced by the Ecclesiastical Courts, and unless sufficient cause is shown, a verdict for damages in a Court of Common Law is requisite, before Parliament will take jurisdiction.   The whole proceedings, from the libel filed in the Ecclesiastical Court, up to the final decree by Parliament, are, in every essential requisite, *judicial.*   The formal petition to the House of Lords, with an office copy of the judgment and' proceeding in the Court, notice to the defendant, the examination of witnesses, the hearing of counsel, and the judgment pronounced, all clothe it with a judicial character, of which it is impossible to divest it—done, it is true, by Parliament, but by virtue of its omnipotent power.

The case in the Supreme Court of Maryland, reported in 1st Gill and Johnson, 464, was where the legislature had granted a divorce *a mensa et thoro*.   This authority, and the one from Connecticut, are mainly relied on by respondent's counsel.

If the Legislature of Maryland based its rightful exercise of this power, as is intimated in the authority, upon any analogy to Parliament, it is obvious it cannot be sustained. The claim of omnipotent power in Parliament rests upon the fact, that it is unfettered by a written constitution—that it stands in place of the people, and speaks the language of absolute sovereignty.   Smith on the Constitution.   But this principle in the English Government is not recognized in the United States.   It is at war with our institutions, and is but another name for despotism.   See 1st Kent's Commentaries, 426.   It is also said by the Court in this case, "that the General Assembly of Maryland exercised the power of granting divorces, for the want, perhaps, of Ecclesiastical Courts to effect it."   But the Ecclesiastical Courts of England had not the power of granting divorces *a vinculo*, and in this

respect, at least, their existence in that State, with all their power of ex-communication, would have been of no avail. But if the reason assigned be a good one, why is it that the legislature does not also claim cognizance of all other matters appertaining to the marriage relation, and decree alimony to the wife ?—for that was, and is, within the exclusive jurisdiction of the Ecclesiastical Courts of Great Britain. But the conclusion of the Court, why the divorce granted by the legislature in that case was a *legislative*, and not a *judicial* act, is manifestly based upon another point. In Maryland, there was no law authorizing any Court to decree a divorce, and from this it was insisted that the authority was within the province of the legislature. The Court says—" She could have recovered a suitable maintenance in a Court of Chancery. If she could have been thus redressed by an exercise of judicial authority, we would ask, is it not fair to conclude that the redress (alimony) granted her by the legislature is an exercise of judicial authority ?" The Court held the act of the legislature valid as to the *divorce*, but invalid as to *alimony*, upon the ground that, for the latter, the party had her redress in the Courts—for the former, none ; and hence the conclusion of the Court, that the first was a *legislative*, and the latter a *judicial* act. Without adopting the opinion of the Court, the authority as it stands is against the respondent—for, if the *law* vesting this power in any particular branch of the government be a true test of its character, then the act of the Legislative Council of Florida, giving to the Courts jurisdiction in cases of divorce, passed in 1828, is conclusive proof that the act divorcing respondent was a *judicial* act.

I regret being also compelled to differ from the learned judge who delivered the opinion of the Court in the case reported in 8th Connecticut Reports, 547 ; but in my opinion, the authority cannot be sustained on principle. The Supreme Court of that State (Peters, Justice, dissenting,)

held that the legislature possessed the power of granting divorces—that, under the original charter of the government, this power was exercised like that of the Parliament of England—that the constitution of 1818 was not a *grant*, but a *limitation* of power in the legislature, and that if this body were authorized to *make a law*, giving power to some *tribunal* to grant divorces, it could do so itself directly, by a sovereign act, and in the exercise of a constitutional right.

I fully concur in the construction given by the Court to the constitution of 1818, but the fact of its being a *limitation*, and not a *grant* of power, leads my mind to a different conclusion from that arrived at by the Court ; for conceding the absolute supremacy of the legislature of that State prior to the constitution of 1818, yet that instrument, by declaring as it does, that the executive, legislative and judicial departments of the government shall, thereafter, remain separate and distinct, did, in terms and emphatic language, *restrict* the legislature from the exercise of judicial functions, and if that body had "reserved rights," (which was doubtless true,) it certainly was not one of them, in the face of this limitation, to assume the *administration* of the laws by dissolving a contract.

Every legislative body necessarily has the power to pass laws affecting the remedy, and empowering the Courts to enforce that remedy ; but it does not *follow*, that it can administer the law itself ; for the obvious reason, that the exercise of the one is within its province, and the other out of it. The legislature of Connecticut, it is true, has exercised judicial powers from the commencement of her civil polity, and probably to a greater extent than any other State in the Union. This, no doubt, has arisen from the fact, that originally there was a union of all the departments of government, and a concentration of the powers of all in the legislature, or general court. I am aware that it has been held ·that this *usage*, on the part of the legislature, to exercise

judicial functions, " made up a part of the constitution of that State," and, under this construction, the right to grant new trials and divorces, has been conceded to the legislature. If it be true, as is contended by the Courts, "that *usage* and the *Constitution* are synonymous terms in that State," (2 Root's Reports, 350,) then the argument is at an end, and, by a parity of reasoning, the principle will apply to Florida, and every State in the Union, But I humbly submit, that the terms are not synonymous in any conceivable sense. I cannot well understand how the usage of a legislative body can be appealed to, to determine the *limitation* of power imposed by the Constitution of a State. If *usage* is to be the test of constitutional power, and the interpreter of constitutional rights, then it becomes the paramount law, and government is thrown back, and resolved into its original elements. Whence the necessity of the people assembling convention, asserting their power, and declaring their rights ? Why have a constitution, if its operation is to be controlled, and its powers fettered and restricted, by previous custom ?

If this be the science of government, then it must forever remain stationary—no progress—no improvement—and the principle upon which our's is based is a false one—false both in theory and practice. If *usage* and the constitution are convertible terms, then I can well understand the doctrine, that a State Legislature may claim the omnipotence of the British Parliament. It has been truly said, that our constitutions originated in a spirit of distrust to legislative power, (Smith on the Constitution,) and we are not without evidence in our own country that, while other departments of government are content to remain in the spheres marked out for them by the constitution, the tendency of the legislative department is to absorb all power. Mr. Madison says—" The legislative department is every where extending the sphere of its activity, and drawing all power into its impetuous vortex." Federalist, page 278.

6

It is very far from being true, even in political science, that the exercise of a *power* by a legislature is evidence of a *right*.   The exercise proves nothing but the fact—it does not establish a principle, and it would be a most fearful doctrine in a free government to hold, that a legislative exposition of a constitutional restriction upon its own powers was proof of the fact.   It would be a judicial determination of a constitutional question, of right belonging to a co-ordinate branch of the government.

If the constitution of a State has any vitality at all, its provisions, separating the several departments of government, do necessarily, as they were designed, restrict this prior usage within constitutional bounds, and prevent a blending together of those powers, which the wisest and best of men have considered the only safe guarantee to public liberty and private rights.   I am satisfied in my own mind, that when a constitution declares that the judicial and legislative powers shall remain *separate* and *distinct*, or where, as in the organic law of Florida, they are separated without the use of these words, the exercise of judicial power by the legislature is an infraction of the constitution, and, therefore void.   The use of these words is as positive and well defined a restriction, as that contained in the Constitutions of Massachusetts and Alabama, declaring that the legislature should *never* exercise any judicial powers. See Watkins v. Holman, 16 Peters, 60.

The fundamental principle of every free and good government is, that these several co-ordinate departments forever remain separate and distinct.   No maxim in political science is more fully recognized than this.   Its necessity was recognized by the framers of our government, as one too invaluable to be surrendered, and too sacred to be tampered with. Every other political principle is subordinate to it—for it is this which gives to our system energy, vitality and stability.   Montesquieu says there can be no liberty, where the

judicial are not separated from the legislative powers. 1 *Spirit of Laws*, page 181. Mr. Madison says these departments should remain forever separate and distinct, and that there is no political truth of greater intrinsic value, and which is stamped with the authority of more enlightened patrons of liberty. Federalist, 270.

It is only by keeping these departments in their appropriate spheres, that the harmony of the whole can be preserved—blend them, and constitutional law no longer exists. The purity of our government, and a wise administration of its laws, depend upon a rigid adherence to this principle. It is one of fearful import, and a relaxation is but another step to its abandonment—for what authority can check the innovation, when the barriers so clearly defined by every constitutional writer, are once thrown down. Each department is a blank in government, without the aid and co-operation of the others ; and when one is encroached upon, its powers, to that extent, become paralyzed, and the whole system fails to carry out those high purposes for which it was designed. Under all circumstances, it is the imperative duty of the Courts to stand by the constitution.

It is contended that the provision in the constitution of our State, declaring that divorces shall not be allowed but by judgment of a Court, is to be construed into an admission of this power in the legislature prior to the constitution. Just the reverse is true—the provision itself was unnecessary—the separation of the departments of government was comprehensive enough. But this provision has a meaning not apparent on its surface. In my opinion, it is a strong and emphatic condemnation by the people of this *usage* on the part of the legislature to assume powers not of right belonging to it.

It is also said that, inasmuch as Congress repealed many acts of divorce passed by the Legislative Council, and did not repeal this, it became valid, by the implied sanction of

Congress. My answer to this is, that it was out of the power of Congress itself to pass the act, and that it could not, by its approval, make that valid, which was, *ipso facto,* void under its own grant, as well as the Constitution of the United States, which I will endeavor to show ; and, secondly, no approval by Congress is to be inferred from its silence. Many acts of the Council silently acquiesced in by Congress, have been declared unconstitutional, and set aside by the Courts of the Territory, in the exercise of legitimate powers granted to them.

If the legislature passed this act in violation of the organic law, it was void, and if Congress could, by its approval, make that a law which was no law, it was assuming to legislate directly on the question of divorce. This it could not do. But it is said, how can Congress authorize any tribunal to do that which it cannot do itself? The answer is a plain one. The powers of the Federal Government being purely derivative, the authority of Congress to establish and organize a Territorial Government is not an *original* power, but a *limited* one, derived from a *specific* grant in the constitution ; and in the exercise of this power, it could establish judicial tribunals, possessing *all the powers incidental to them;* but it does not follow, that Congress could exercise *judicial* functions. Chancellor Kent (2d Commentaries) says the repeal of these acts of divorce by Congress, amounts to a strong national condemnation of the exercise of this power by a legislature. There is another point presented by the record in this case, which I think it my duty briefly to consider—it is, whether this act of the legislature is not unconstitutional, on the ground that it impairs the obligation of a contract.

It is insisted that marriage is but a *civil relation,* and not embraced within the definition of a *contract,* as used in the constitution. In England, as well as in this country, all legal writers consider it *as purely a civil contract.* It is true

it is a civil relation, but *non constat*, it is not a contract in the strict, legal definition of the term.   Every contract creates a legal relation between the parties.   Blackstone says that "the law of England considers marriage in *no other* light than as a civil contract, and viewing it in this civil light, the law *treats* it as it does all other contracts."   1 Blackstone's Commentaries, 448.   Rutherford says the contract of marriage creates important legal rights in the person and property of the other.   1 Institutes, 314.  See, also, Bacon, 476, 488.   The contract creates mutual rights, duties and obligations, deeply interesting to society, it is true, but none the less important and valuable to the contracting parties.   It is municipal, as it affects the public—it is a contract, as it affects the rights of the person and the rights of property—it has all the attributes of a pure contract, whether we consider the capacity of the parties to contract, the subject-matter, or the consideration ; and the rights growing out of it can be asserted and enforced in a court of justice.   A man has as good a right to the property acquired by marriage, as that acquired under any other contract.   Mr. Justice Story says, " As to the case of the contract of marriage, which the argument supposes not to be within the prohibitory clause, (of the constitution,) because it is a matter of civil institution, I profess *not to feel the weight of the reason assigned for the exception*.   In a legal sense, all contracts, recognized as valid in any country, may be properly said to be matters of civil institution, since they obtain their obligation and construction *jure loci contractus*." 4 Condensed Supreme Court Reports, 520.  I know of no reason why the word contract, as used in the Constitution, should be restricted to those of a pecuniary nature, and not embrace that of marriage, involving, as it does, considerations of the most interesting character and vital importance to society, to government, and the contracting parties.   It is comprehended by the words of the Constitu-

tion, and there is no rule of construction that would exclude it, in the absence of any thing to show that it is not within its spirit.    9th Gill and Johnson.    And what are the *obligations* of the contract, but the rights and duties which grow out of it?    A legislative act which discharges the duties and destroys the rights acquired under any contract, must, of necessity, impair its obligation.    A law affecting the remedy, does not impair the obligation, but an act of the legislature, dissolving the contract, *destroys* the obligation.

In every respect in which I have been able to see this case, I can find no reason to sustain the act of the legislature.    It appears by the record, that the parties were domiciled in the State of Georgia, where, it is alleged, the desertion and ill treatment occurred.    The wife, living with the testator, Graham, removed to Florida—while the husband returned to Carolina, his former residence.    The bill was introduced into the legislature one day, and passed the next.    It is very clear that this divorce would not be recognized by the Courts of Georgia or Carolina, were any rights asserted under it in those States.    There was an utter want of jurisdiction over the person, as well as the subject-matter, and an act thus passed in defiance of the maxim, *audi alteram partem*, has no merit to recommend it to this Court.    The husband, in this case, in the language of Chief Justice Story, "had as good a right to his wife, as his property, acquired under the marriage contract—he had a legal right to her society and fortune, and to divest him of these rights, without his default, and against his will, was as flagrant a violation of the principles of justice, as the confiscation of his estate."    4 Condensed Supreme Court Reports.

I am, therefore, of opinion that the act of the Legislative Council of February 11th, 1832, was in conflict with the organic law of Florida and the Constitution of the United States, and is, therefore, void.

*Per Curiam.*—Let the judgment of the Court below be reversed.