277 So.2d 266 (1973)
William R. RYAN, Petitioner,
v.
Rose E. RYAN, Respondent.
No. 42427.
Supreme Court of Florida.
March 30, 1973.
*268 Robert W. Shaughnessy, Perrine, for petitioner.
Ward, Ward, Straessley, Hiss & Heath, Miami, for respondent.
Robert L. Shevin, Atty. Gen., and Barry Scott Richard, Deputy Atty. Gen., as intervenors.
DEKLE, Justice.
We have for consideration three certified questions of law submitted by the Circuit Court of the Eleventh Judicial Circuit concerning the constitutionality of Florida's new dissolution of marriage law, Fla. Stat. Ch. 61, F.S.A., F.A.R. 4.6, subd. a, 32 F.S.A.[1]
The three questions certified to us are as follows:
"1. Whether Florida Statutes Chapter 61 which abolished former grounds for divorce and provided as sole ground for divorce that:
(1) the marriage is irretrievably broken, and/or
(2) insanity or mental incompetence
is constitutional in that it does not impair the obligation of the marriage contract nor adversely affect property rights of the parties?
"2. Whether Florida Statute Chapter 61 which provides for the granting of a dissolution of marriage upon the court's finding that the marriage is irretrievably broken is unconstitutional in that it is vague, uncertain and indefinite?

"3. Whether Florida Statute Chapter 61 is unconstitutional because it applies retroactively to marriages entered into prior to July 1, 1971?" (emphasis added)
These questions seek our constitutional interpretation of the new "no-fault" divorce law. The first question has two parts: Does the new dissolution law "impair the obligation of the marriage contract" in violation of Fla. Const. art. I, § 10, F.S.A.; does it "adversely affect property rights of the parties." We shall examine and decide these related issues together.

PROPERTY RIGHTS
Fla. Const. § 10 of the Declaration of Rights (Art. I) states that: "No ... law impairing the obligation of contracts shall be passed." The respective parties argue at length with regard to whether or not marriage is a contract thus protected, citing various cases on the point.
This Court said as early as Ponder v. Graham, 4 Fla. 23, in 1851, that marriage is a contract. We have consistently since that time referred to "marriage contracts" for over 120 years of Florida Jurisprudence. As recently as Belcher v. Belcher, *269 271 So.2d 7 (Fla. 1972), we referred to the obligation of the husband to support his wife during continuation of the marriage contract, thus still holding our view of marriage to be a "contract" rather than a mere "relationship" as suggested in Gleason v. Gleason, 26 N.Y.2d 28, 308 N.Y.S.2d 347, 256 N.E.2d 513 (N.Y.Ct.App. 1970), and in an 1888 U.S. Supreme Court case cited by appellee, Maynard v. Hill, 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654. In that U.S. Supreme Court holding, however, and in others[2] it is pointed out that the contracts which were designed to be protected under the constitutional provision are those contracts providing certain, definite and fixed private rights of property which are vested in the contract.
The query arises then whether dower or curtesy is a "property right" of a spouse thus protected. The inchoate right of dower is statutory and not a matter of contract, even though such right does indeed grow out of the marriage by virtue of the parties having "contracted" for that marriage. See also 52 Am.Jur.2d, Marriage, § 5.
Dower is not a vested right.[3] We have said that because of its defeasible nature dower is not to be given consideration in divorce or dissolution of marriage proceedings. Bowler v. Bowler, 159 Fla. 447, 31 So.2d 751 (1947).
Dower is, as stated, statutory in nature. Fla. Stat. § 731.34, F.S.A. It is an expectancy, not a present estate (thus "inchoate").[4] This Court, in Neal v. McMullian, 98 Fla. 549, 124 So. 29-30 (1929), plainly held:
"During the life of the husband the right is a mere expectancy or possibility. In that condition of things, the law making power may deal with it as may be deemed proper. It is not a natural right. It is wholly given by law, and the power that gave it may increase, diminish, or otherwise alter it, or wholly take it away. It is upon the same footing with the expectancy of heirs, apparent or presumptive, before the death of the ancestor. Until that event occurs the law of descent and distribution may be molded according to the will of the Legislature.
* * * * * *
"In fact, whether or not the inchoate right of dower will ever merge into title and control of the property depends upon many contingencies, all of which are enumerated in the above quoted statute." [predecessor to Fla. Stat. § 731.34] (emphasis added)
Thus there is no argument with the statement in the later case of Gore v. General Properties Corp., 149 Fla. 690, 6 So.2d 837, 839 (1942), that "an inchoate right of dower does not constitute an estate, title, or interest in land."[5] See also, Williams v. Ricou, 143 Fla. 360, 196 So. 667, 670 (1940), where this Court held that a wife simply has no right to claim dower so long as her husband is still living. The same would apparently apply likewise to a husband's curtesy.
We note in this connection that our Fourth District in Dal Brun v. City of West Palm Beach, 227 So.2d 347 (Fla. App.4th 1969), has also held that a wife's inchoate right of dower is cut off and extinguished *270 upon condemnation of the property under the right of eminent domain.
Next we inquire: Is potential alimony such a "property right" under the contract of marriage as to be "impaired" contrary to Fla. Const. § 10 Decl. of Rights? Under the foregoing analysis of dower we must hold likewise that this contingent interest does not fall within the constitutional prohibition. The same result is true as to equitable interests claimed in the property of a spouse by virtue of contributions of services or other considerations within the marriage, other than interests which have already vested. (Actual transfers and independent interests not inherent in the marriage stand independently.) Such a potential equitable interest as alimony is not yet vested but arises upon subsequent judicial determination (or settlement). True, an ultimate award of such an interest upon a termination of the marriage contract (or a legal separation) stems from the marriage. Without it, such an interest would not have arisen. But these potential interests are not those property rights contemplated by the constitutional prohibition.[6]

VAGUE and INDEFINITE CHALLENGE
The next question of law concerns that part of F.S., Section 61.052, F.S.A., reading:
"(1) No judgment of dissolution of marriage shall be granted unless one of the following facts appears, which shall be pleaded generally:
(a) The marriage is irretrievably broken... ."
The quoted language read in context with the remainder of the statute expresses the purpose and intent of the Legislature with sufficient clarity to render it invulnerable to attack that it is unconstitutionally vague and indefinite.
The word "irretrievably" is defined: "impossible to recoup, repair or overcome." Webster's Third International Dictionary (1966), page 1196.
When compared with the fourth statutory ground for divorce, "extreme cruelty," in the former statute (§ 61.041(4), F.S. 1969, F.S.A.), the new language for dissolution of marriage, "irretrievably broken," appears to us to be no more susceptible to the charge of vagueness than were the words, "extreme cruelty." "Extreme cruelty" in the former divorce law was held in case after case to envision a great variety of faults and wrongdoings that were deemed sufficient for the granting of divorce, but the phrase was never invalidated for vagueness or overbreadth. For example, in Diem v. Diem, 141 Fla. 260, 193 So. 65, 66, this Court held the phrase, "extreme cruelty," as a ground for divorce to be "relative." The Court added:
"What constitutes it may be determined by the degree of one's culture, his emotions, nervous reaction or moral sense."
The principles set forth in State ex rel. Lee v. Buchanan, 191 So.2d 33 (Fla. 1966); Locklin v. Pridgeon, 158 Fla. 737, 30 So.2d 102 (1947); Franklin v. State, 257 So.2d 21 (Fla. 1971); and State v. Barquet, 262 So.2d 431 (Fla. 1972), declaring certain statutes unconstitutionally vague and indefinite, have no application here. Those cases related to statutes denouncing criminal offenses. Moreover, in those cases the vagueness complained of in the statutes under attack was quite different from the instant clear statutory issue of whether a marriage has reached terminal stage in point of fact. The holdings in such cases as City of St. *271 Petersburg v. Calbeck, 114 So.2d 316, at 319-320 (Fla.App.2d 1959); McArthur v. State, 191 So.2d 429 (Fla. 1966); Smith v. State, 237 So.2d 139 (Fla. 1970); and Smith v. State, 239 So.2d 250 (Fla. 1970), which apply a test of "reasonable certainty" appear more in line with a consideration of the present statute which meets such a test.
It is the duty of a court to recognize a reasonable construction of a statute which supports its constitutionality.[7] The Legislature does not have to give a detailed and carefully outlined plan of each and every step to be followed in each and every circumstance which could arise. We said in Smith v. State, 237 So.2d 139 (Fla. 1970), quoting from People v. Smith, 36 Cal. App.2d Supp. 748, 92 P.2d 1039, 1042 (1939):
"`To make a statute sufficiently certain to comply with constitutional requirements it is not necessary that it furnish detailed plans and specifications of the acts or conduct prohibited... .'"
Under the principles enunciated above, the statute meets the challenge of constitutional vagueness.

PLEADINGS
It is sufficient in the petition simply to allege as an ultimate fact that the marriage is "irretrievably broken"; however, the chancellor must determine from the particular facts of each case whether a marriage is "irretrievably broken," subject, of course, to appellate review. Just as "extreme cruelty" was held in divorce cases to cover a wide range of factual predicates for divorce, so the phrase "irretrievably broken" embraces numerous factual bases for dissolution of marriages. However, by the express language of the new statute now, dissolution of marriage is no longer granted because of the fault or wrongdoing or misconduct of one or both parties, as was the case under the grounds for divorce under former Section 61.041, F.S. 1969, F.S.A. The new statutory test for determining if a marriage is irretrievably broken is simply whether for whatever reason or cause (no matter whose "fault") the marriage relationship is for all intents and purposes ended, no longer viable, a hollow sham beyond hope of reconciliation or repair.

PROOF
It is suggested that a circuit judge would hesitate to adjudicate that a marriage is not "irretrievably broken" under the present statute when the petitioner simply says that is the fact; that the judge becomes nothing more than a ministerial officer receiving the "irretrievably broken" message and having so received it, being thus compelled to drop this legislative guillotine upon the marriage, thus excising the troublesome mate from the petitioner because the petitioner has subjectively and unilaterally determined that his marriage is irretrievably broken.
We do not view the matter of dissolution as being such a simple, unilateral matter of one mate simply saying "I want out." All of the surrounding facts and circumstances are to be inquired into to arrive at the conclusion as to whether or not indeed the marriage has reached the terminal stage based upon facts which must be shown. Even in uncontested dissolutions, the court would properly make inquiry to determine this fact, for the statute itself in § 61.052 provides in subsection (2) the basic predicate: "Based on the evidence at the hearing... . [and even] (a) ... if the respondent does not ... deny that the marriage is irretrievably broken, the court shall enter a judgment of dissolution of the marriage, if the court finds that the marriage is irretrievably broken." (emphasis added)
*272 It is argued that the provision in the statute for continuing the proceedings for a period not exceeding 90 days to allow the parties to effect a reconciliation, is inconsistent with the objective of determining if in fact there is no further chance for the marriage to succeed. Actually, this further test of the marriage supports the requirement that the court must make a determination, beyond a petitioner's bare assertion, that in truth and in fact the marriage is "irretrievably broken."
And so it is that in every instance the court should make that determination by proper inquiry. It is never a simple matter of "Is your marriage `irretrievably broken'?" "Yes, your honor, I believe it is." And that ends it, like the oriental ritual of the husband severing his marriage by tossing three stones in the sand one by one and in sequence saying, "I divorce thee; I divorce thee; I divorce thee." There must be appropriate evidence (albeit uncorroborated as the statute allows) that in truth and in fact the marriage is irretrievably broken.
In Posner I, 233 So.2d 381 (Fla. 1970), quoting from Underwood v. Underwood, 12 Fla. 434, we stated the law still to be as follows: (233 So.2d p. 383)
"... it `would be aiming a deadly blow at public morals to decree a dissolution of the marriage contract merely because the parties requested it . .. .'"

FORMER DEFENSES ELIMINATED
The new Act includes a provision, § 61.044, entitled "Certain Existing Defenses Abolished" and provides:
"The defenses to divorce and legal separation, of condonation, collusion, recrimination, and laches are abolished."
The heretofore well-known defenses of condonation and recrimination found their genesis in the equitable "clean hands"[8] doctrine but even prior to this new legislative enactment, we had to some degree modified strict recrimination as a defense in the case of Stewart v. Stewart, 158 Fla. 326, 29 So.2d 247 (1947). There the Court found both pairs of hands so unclean that it was hardpressed to apply the doctrine against both parties and therefore proceeded to call it "a qualifying doctrine" and frankly stated that if the doctrine were applied strictly it would in such circumstances result in "great inequity" in that neither party to the suit had been free from fault. That opinion in Stewart did however reiterate that the application of the doctrine of clean hands still existed as a matter of judicial discretion and public policy.

FRAUD
Now we find, however, that by virtue of the new legislative action that the clean hands principle has been eliminated in marriage dissolution except for fraud and deceit which are always available in our courts. A contrived, false or fraudulent creation of the ground upon which dissolution is sought, for the very purpose of terminating the marriage through what amounts to a misuse and, in effect, a fraud upon the courts could no more be tolerated in this than in any other litigation. The courts will not knowingly become a party to contrivance or fraud, even in the simplified basis for divorce which has now been created by the new statute. This is inherent in the judicial process. It is not limited *273 to a future discovery of the fraud but may become apparent in the proceedings for dissolution, in which event the court should deal directly with it in such proceedings. In this there may be a direct fraud perpetrated upon the other spouse by misrepresentations, concealments or untruths, manifesting itself either in the course of the proceeding or at a later time. The courts will not indulge or reward falsehood and when such a purposeful inducement or fraud upon the other spouse or the court is made to appear by the evidence, then there would be a failure of proof that the marriage was irretrievably broken. The proof having failed in such instance, there would accordingly not be sufficient evidence upon which to grant the relief sought. This is not based upon a continuation of "fault" as a basis for relief which was required under the former divorce law but as a matter of fraud and deceit. This recognition of such a fundamental concept of equity is necessary in order to preserve the integrity of the judiciary, lest it become a party to a fraud or allow a misuse of the judicial machinery. Not even under statutory imposition can an independent judiciary which is the ultimate protector of right and justice, be subjugated and undermined.
We recognize that the new "no fault" concept was a principle basis of the new legislation for a desired simplification of the procedure aimed at reducing the trauma of the dissolution experience. That is a legislative judgment. The foregoing remaining intolerance of fraud or deceit is a judicial prerogative, to protect against fraud by a party and misuse of the courts and which we view as legally consistent with the new law.

NOT RETROACTIVE
The third question is directed to the constitutionality of the Act as allegedly applying retroactively to marriages prior to the Act, that is, prior to July 1, 1971, and thus void under Fla. Const. art. I, § 10, and the federal constitution. We have heretofore held that the authority to regulate marriages and correspondingly to provide for their dissolutions is vested in the Legislature.[9] It is inherent in the state's police power to do so in the regulation of society and its relationships, including the very essential and important family relationship within marriage. The marriage contract perhaps more than any other has a vital and essential effect on the very life and society of the State and therefore is a very proper subject of the State's police power; the subject of marriage (and correspondingly the dissolution thereof) has a very definite bearing upon the public interest with which the Legislature is concerned and charged with its regulation.
The Legislature as representative of the people should regulate marriage and the family relationship, and those matters affecting the members of the family in that affinity, in such manner and from time to time as the wisdom of the people may be reflected in the actions of their elected representatives. You might say: "For better, for worse." It must be remembered that the State has always been considered a "third party" or "third interest" in divorce and the family tie.[10]
Petitioner challenges the authority of the Legislature to extend the law to "grant" dissolutions upon a new, simplified test of whether the tie is "irretrievably broken." It is urged as unconstitutional to apply the new law to existing contracts of marriage entered into under the prior law which, it is claimed, was a part of that marriage contract  now being "broken" by legislative action without due process of judicial considerations of notice and hearing. The only trouble with this contention is that the *274 "remedy" (the procedure provided in the new law for dissolution) is the ongoing prerogative of the Legislature which also legislates the marriage in its creation. "... the Lord gave, and the Lord hath taken away."[11]
There is, as we have said, no impairment of contract here. Neither is there denial of due process in the manner in which the machinery is set up for judicial determination regarding termination of the marriage. The law provides that consideration be given to support provisions and to any interest of the wife in property of the husband by way of special equity or otherwise.[12] Due process basically is met upon a provision for notice and opportunity to be heard.[13] Of course these are included in the new law, as such requirements were also included in the law in existence when past marriages were entered into. Accordingly, it cannot be maintained with validity that the new provision regarding the same subject matter is void because it affects "retroactively" those earlier marriage "contracts" and the applicable procedures and remedies, which are subject to proper change from time to time.[14]

LEGISLATIVE PREROGATIVE
An additional argument is that the new dissolution of marriage law constitutes an encroachment upon the judiciary. In all candor we must recognize that the matter of divorce is a legislative prerogative.[15] We do not have ecclesiastical courts.[16] In the language of the poet, it might be said as to the role of the courts upon such legislative action: "Theirs not to make reply; Theirs not to reason why... ."[17] The change in philosophy, a different approach to the dissolution of marriage (a legislative prerogative) may add to today's moral erosion of contemporary standards in reflecting an unprecedented disregard, even scorn, for law and basic morality. It may also be that the family relationship and provisions for support are no longer protected by the laws of this state by requiring proof of misconduct before such rights can be taken away, but these matters of individual rights, social mores and of state policy are to be settled in the caldron of the people's representative government, the Legislature, by such representatives as the people choose to elect, upon whatever they may have represented to the people that their standards are. If the electorate finds it has been misled in such standards, or wishes to change them, the polls will open again.[18]
The role of the courts remains one of restraint in the application and interpretation of those laws which eventually are passed, no matter our personal disagreement or concurrence in them so long as they do not violate constitutional or other legal requirements. It is more important that the basic separation of powers in our independent branches of government be preserved than it is that we project our own concept of the public good by reaching beyond the traditional judicial limitations of these protective boundaries of the separate, *275 independent divisions of government.[19] Otherwise, we would, more seriously, erode our basic principles of the democratic process which has proved in its ups and downs, its changes and reversions, still to be the most successful form of free government ever conceived by mankind.
In State ex rel. Northern Imvestment Corp. v. Lee, 134 Fla. 276, 183 So. 838, 841 (1939), this Court quoted liberally from Ponder v. Graham, 4 Fla. 23, 42-43 (1851), as it had in Thursby v. Stewart, 103 Fla. 990, 138 So. 742 (1931):[20]
"The fundamental principle of every free and good government is, that these several co-ordinate departments forever remain separate and distinct. No maxim in political science is more fully recognized than this. Its necessity was recognized by the framers of our government, as one too invaluable to be surrendered, and too sacred to be tampered with. Every other political principle is subordinate to it  for it is this which gives to our system energy, vitality and stability. Montesquieu says there can be no liberty, where the judicial are not separated from the legislative powers. 1 Spirit of Laws, page 181. Mr. Madison says these departments should remain forever separate and distinct, and that there is no political truth of greater intrinsic value, and which is stamped with the authority or more enlightened patrons of liberty."
Better we weep over questioned legislation, or judicial decisions for that matter, and strive within the proper channels for desired change, than destroy the system, for whatever well intended purpose. Such is the reasoning behind the oft-mentioned reference to our legal system as one "of laws, not of men." Sometimes it is not easy, but it is imperative to the survival of the democratic process.
Our statement in Pepper v. Pepper, 66 So.2d 280 at 284 (Fla. 1953), was referring to this principle when we said:
"The Judicial Department is not concerned with the wisdom of such legislation as that involved in the present litigation. Whether divorces should be granted, and if granted, only for the cause of adultery; whether the residence requirement should be three months, six months, or two years, are matters for the Legislature to decide; and when the decision has been made, it becomes incumbent upon the Judicial branch to enforce it." (emphasis added)
Appellant urges Ponder, supra, as a basis for voiding the legislative provision for "no fault divorce." The dissolution of marriage provided in the new law is not, however, "a legislative divorce" which was granted in the early day of Ponder, supra, by the Legislative Council of Florida without reference to the courts. Ponder is not then precedent for a prohibition of the Legislature to regulate and provide grounds and procedures for dissolution of marriage.
Ponder involved an 1832 act of the Legislative Council of the Territory of Florida entitled "An Act For the Relief of Mary Canady" wherein that body proceeded ipso facto to dissolve or annul outright the bonds of matrimony of the said Mary and one Solomon Canady. That, of course, is quite different from a judicial consideration of the dissolution of marriage for which the present Legislature has provided in the proceeding in the courts. In Ponder, Mary, being then married to Mr. Canady, came to Florida where she proceeded to cohabit with one Mr. Graham and thereafter that early Legislative Council of the Territory saw fit to "dissolve" her previous marriage. This was of course an invasion *276 of the judiciary and recognized as such by the holding in Ponder that such individual act was unconstitutional. It does not, however, stand as precedent here. The decision in Ponder in rejecting such "legislative divorce" actually reflects a healthy respect for the judiciary's role and also a repugnance for legislation which has solely such a private limited purpose.
The statute has of course since its passage been presumptively valid. This opinion could have no adverse binding effect upon cases heretofore decided under this statute and shall apply only to those causes not yet heard and ruled upon in the trial court.
The questions certified are accordingly answered as herein set forth and the cause is remanded for further proceedings before the trial court consistent herewith.
It is so ordered.
CARLTON, C.J., ERVIN, BOYD and McCAIN, JJ., and MASON, Circuit Judge, concur.
ROBERTS, J., dissents with opinion.
ROBERTS, Justice (dissenting).
Section 61.011, Florida Statutes, F.S.A., entitled, "Dissolution in Chancery", provides that proceedings under this act relating to dissolution of marriage are to be in chancery (equity).
One of the most elementary and fundamental concepts of equity jurisprudence and a universal rule which affects the entire system of equity jurisprudence is the maxim that "He who comes into equity must come with clean hands." This principle is founded upon conscience and good faith.
"Whatever may be the strictly accurate theory concerning the nature of equitable interference, the principle was established from the earliest days, that while the court of chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of the law, or even in contradiction to those rules, while it could act upon the conscience of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscientious or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies." 2 Pomeroy, Equity Jurisprudence, 5th Edition, § 398, p. 93.
If one who seeks to set the judicial machinery in motion has violated conscience or good faith, the doors of the court of equity will be shut against the actor. By employing the doctrine of unclean hands the courts of chancery will refuse to acknowledge his right or to award him any remedy. A litigant may be denied relief by a court of equity on the ground that his conduct has been inequitable, unfair or unconscientious in respect to the matter concerning which he seeks relief. National Fire Insurance Co. v. Thompson, 281 U.S. 331, 50 S.Ct. 288, 74 L.Ed. 881 (1930); Keystone Co. v. Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933); Nedd v. Starry, 143 So.2d 522 (Fla.App. 1962); Gables Racing Association v. Persky, 148 Fla. 627, 6 So.2d 257 (1940). In the very early decision of Bein v. Heath, 6 How. 228, 247, 12 L.Ed. 416, the Supreme Court of the United States opined,
"It is a principle in chancery that he who asks relief must have acted in good *277 faith. The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abetter of iniquity."
Subsequently, in Deweese v. Reinhard, 165 U.S. 386, 390, 17 S.Ct. 340, 341, 41 L.Ed. 757, the Supreme Court of the United States stated:
"A court of equity acts only when and as conscience commands; and, if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses, and whatever use he may make of them in a court of law, he will be held remediless in a court of equity."
The maxim of unclean hands has continuously been held to be applicable to divorce suits. Previous to the enactment of Florida's new dissolution law, it was held that a court of equity would not grant a divorce to a spouse who is responsible for the wrongs and injuries complained of, that is one who comes into equity with unclean hands. Sahler v. Sahler, 154 Fla. 206, 17 So.2d 105 (1944); Gordon v. Gordon, 59 So.2d 40 (Fla. 1952) cert. den., 344 U.S. 878, 73 S.Ct. 165, 97 L.Ed. 680; Hudson v. Hudson, 59 Fla. 529, 51 So. 857 (1910); Busch v. Busch, 68 So.2d 351 (Fla. 1953); Stewart v. Stewart, 158 Fla. 326, 29 So.2d 247 (1947); Stehli v. Thompson, 151 Fla. 566, 10 So.2d 123 (1942); Devlin v. Devlin, 157 Fla. 17, 24 So.2d 704 (1946); Furman v. Furman, 130 So.2d 316 (Fla.App. 1961); Choucherie v. Choucherie, 120 So.2d 821 (Fla. App. 1960).
However, the newly enacted act relating to dissolution of marriage which became effective July 1, 1971, includes a provision, Section 61.044, entitled "Certain existing defenses abolished", which provides:
"The defenses to divorce and legal separation, of condonation, collusion, recrimination, and laches are abolished."
This Court in Stewart v. Stewart, supra, found that the defense of recrimination is an application or extension of the doctrine of unclean hands. Therein, this Court explicated:
"The application of the doctrine of recrimination in divorce cases is an outgrowth of the equity maxim that `he who comes into equity must come with clean hands.'
"It is not an absolute but a qualifying doctrine. If it were to be applied strictly great inequity would be done, for it so often happens that neither party to a suit has been free from fault. This is especially true in divorce matters generally, and in this case in particular.
"The principle is most applicable when a party seeks to take advantage of an act or omission which he has himself induced.
"The maxim may be invoked because of the very nature of the wrong either for the benefit of the Court and society or for the benefit of the defendant when to do otherwise would be to allow plaintiff to take an unfair advantage of the defendant.
"The application of the doctrine of recrimination like the doctrine of clean hands is a matter of sound judicial discretion dependent on public policy, public welfare and the exigencies of the case at bar."
When a basic concept of equity such as the principle that, "He who comes into equity must come with clean hands," has developed and survived over centuries, I am unwilling to assume that the legislature meant to repeal the entire doctrine without a specific repealing act. A large body of case law extending over a long period of years, written by many eminent and distinguished jurists has repeatedly reiterated that the "clean hands" doctrine does most assuredly apply to divorce suits.
To hold otherwise would impute to the lawmakers a total lack of interest in the faithful spouse who over a long period of years has suffered abuses and indignities, but who is forced to accept a divorce not because of his or her own wrongdoing, but *278 because the offending spouse has mutilated the marriage. The innocent party's objection to the divorce may well be for good reason, and it seems to me after having been a member of the Bar for 44 years, and a member of this Court for 23 years, to be an odd legal pronouncement to say that an offending spouse could profit by his own misconduct and obtain the sought for divorce because of his or her own wrongdoing and abuses.
Under the majority view a wrongdoing husband can come home every Saturday night for five years, drunk and penniless because of skirt-chasing, gambling, or some other misdeeds; then, he may beat, bruise and abuse his wife because he is unhappy with himself, and then he will be permitted to go down and get a divorce on printed forms purchased at a department store and tell the trial judge that the marriage is "irretrievably broken". Or, the offending wife, after jumping from bed to bed with her new found paramours, chronically drunk, and when at home nagging, brawling and quarreling, all against the wishes of a faithful husband who remains at home nurturing the children, is permitted to divorce her husband who does not desire a divorce, but rather, has one forced upon him, not because of anything he has done, but because the offending wife tells the trial court that her marriage is "irretrievably broken".
In my opinion, the offending spouse should not have standing to obtain a divorce if the innocent one invokes the doctrine that,
"He who comes into equity must come with clean hands."
It is the duty of this Court to seek a construction of a statute which would support its constitutionality.
By merely retaining the "clean hands" doctrine, I could agree that the "no-fault" divorce statute is constitutional, but absent this,
I must respectfully dissent.
NOTES
[1] Jaworski v. City of Opa-Locka, 149 So.2d 33, 34 (Fla. 1963).
[2] See footnote 7, infra.
[3] Dolton v. Cain, 14 Wall. 472, 20 L.Ed. 830, Gleason v. Gleason, 26 N.Y.2d 28, 308 N.Y.S.2d 347, 256 N.E.2d 513 (N.Y. Ct.App. 1970), cf. Simons v. Miami Beach First National Bank, 381 U.S. 81, 85 S.Ct. 1315, 14 L.Ed.2d 232 (1965).
[4] Neal v. McMullian, 98 Fla. 549, 124 So. 29 (1929); Gore v. General Properties Corp., 149 Fla. 690, 6 So.2d 837 (1942); Williams v. Ricou, 143 Fla. 360, 196 So. 667 (1940).
[5] Just as in Bowler v. Bowler, 159 Fla. 447, 31 So.2d 751 (Fla. 1947), appellant's dower rights, if any, will be extinguished if and when the lower court eventually dissolves the marriage.
[6] Maynard v. Hill, 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654 (1887); Hunt v. Hunt, 131 U.S. Append. clxv, 24 L.Ed. 1109 (1879); Trustees of Dartmouth College v. Woodward, 4 Wheat. [17 U.S.] 518, 4 L.Ed. 629 (1819); Tipping v. Tipping, 65 App.D.C. 222, 82 F.2d 828 (1936); Gleason v. Gleason, 26 N.Y.2d 28, 308 N.Y.S.2d 347, 256 N.E.2d 513 (N.Y.Ct. App. 1970); Fearon v. Treanor, 272 N.Y. 268, 5 N.E.2d 815 (1936).
[7] Rainey v. Nelson, 257 So.2d 538 (Fla. 1972); Seaboard Air Line Railroad Company v. Jackson, 235 So.2d 298 (Fla. 1970).
[8] Sahler v. Sahler, 154 Fla. 206, 17 So.2d 105 (1944); Gordon v. Gordon, 59 So.2d 40 (Fla. 1952) cert. den., 344 U.S. 878, 73 S.Ct. 165, 97 L.Ed. 680; Hudson v. Hudson, 59 Fla. 529, 51 So. 857 (1910); Busch v. Busch, 68 So.2d 350 (Fla. 1953); Stewart v. Stewart, 158 Fla. 326, 29 So.2d 247 (1947); Stehli v. Thompson, 151 Fla. 566, 10 So.2d 123 (1942); Devlin v. Devlin, 157 Fla. 17, 24 So.2d 704 (1946); Furman v. Furman, 130 So.2d 316 (Fla. App.3d 1961); Choucherie v. Choucherie, 120 So.2d 821 (Fla.App.3d 1960).
[9] Todd v. Todd, 151 Fla. 134, 9 So.2d 279 (1942); Pepper v. Pepper, 66 So.2d 280 (Fla. 1953).
[10] Hancock v. Hancock, 55 Fla. 680, 45 So. 1020 (1908); Gallemore v. Gallemore, 94 Fla. 516, 114 So. 371 (1927); and Posner v. Posner, 233 So.2d 381 (Fla. 1970).
[11] Job 1:21.
[12] Carlton v. Carlton, 78 Fla. 252, 83 So. 87 (1919); Markland v. Markland, 155 Fla. 629, 21 So.2d 145 (1945); Sharpe v. Sharpe, 202 So.2d 822 (Fla.App.2d 1967).
[13] Tibbetts v. Olson, 91 Fla. 824, 108 So. 679 (1926); State ex rel. Barancik v. Gates, 134 So.2d 497 (Fla. 1961).
[14] Wilensky v. Fields, 267 So.2d 1 (Fla. 1972); Gleason v. Gleason, 26 N.Y.2d 28, 308 N.Y.S.2d 347, 256 N.E.2d 513 (N.Y. Ct.App. 1970); Anno. 23 A.L.R.3d 626.
[15] See footnote 9.
[16] Chisholm v. Chisholm, 98 Fla. 1196, 125 So. 694, 703 (1929).
[17] Charge of the Light Brigade, Alfred Lord Tennyson.
[18] See critiques: The Fla.Bar Journal, Vol. 45, No. 9, p. 568, Nov. 1971 "Faults in Fla. No Fault" by Virginia Anne Church; same Fla.Bar Journal issue, p. 558, article by Keith E. Collyer; and American Bar Journal of Apr. 1972, p. 379, Report of House of Delegates.
[19] Fla. Const. art. II, § 3.
[20] See also Trustees Internal Improvement Fund v. Bailey, 10 Fla. 238, 248-250 (1863); and Smith v. Hines, 10 Fla. 258, 285-286 (1863).