In re the MARRIAGE OF Glenn Gary MITCHELL, Petitioner-Respondent,

and

Sharon Kay Mitchell, Respondent-Appellant.

No. 36771.

Missouri Court of Appeals, St. Louis District, Division One.

Oct. 26, 1976.

Motion for Rehearing and for Transfer to Supreme Court Denied Dec. 20, 1976.

Application to Transfer Denied Feb. 14, 1977.

Shaw, Howlett & Schwartz, Joseph Howlett, Clayton, for respondent-appellant.

Zimbalist & Schramm, Chaim H. Zimbalist, Clayton, for petitioner-respondent.

KELLY, Judge.

Sharon Kay Mitchell, respondent in the trial court, takes this appeal from an order of the St. Louis County Circuit Court granting a decree of dissolution of her marriage with Glenn Gary Mitchell, the petitioner in the trial court. (To avoid confusion, the parties shall hereinafter be identified by the party label employed in the trial court.) The sole issue on appeal is whether there is sufficient evidence to support the order of the trial court finding that the marriage is irretrievably broken and granting the decree of dissolution. We reverse.

■ Review, on appeal, of a court-tried case is governed by Rule 73.01 V.A.M.R. and the case of *Murphy v. Carron,* 536 S.W.2d 30, 32[1–3] (Mo. banc 1976). The decree or judgment of the trial court must be sustained unless there is (1) no substantial evidence to support it, (2) unless it is against the weight of the evidence, (3) unless it erroneously declares the law, or (4) unless it erroneously applies the law. "Appellate courts," the court said in *Murphy,* supra, "should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong."

Petitioner's petition in this case alleged, in addition to the residency of the parties, their marriage, their separation on October 20, 1973, the birth of two minor children of the marriage and that they were in the custody of the respondent, that respondent was not then pregnant, that there is no reasonable likelihood that the marriage of petitioner can be preserved, and is therefore irretrievably broken. He prayed that the marriage be dissolved.

Respondent's Answer admitted the allegations of the petition with respect to residency, the date and place of the marriage, that she and petitioner had not lived together on a continuing basis since on or about October 20, 1973, and the fact that two minor children were born of the marriage and were in her custody. She further alleged that although she and petitioner have not lived together on a continuing basis since about October 20, 1973, he left without her consent and she at all times has desired, and at the time of the separation did desire to continue cohabitating with him. She denied the allegation of his petition that there was no reasonable likelihood

that the marriage could be preserved and was irretrievably broken.

The evidence consisted of the testimony of the petitioner and the respondent, both during the petitioner's case in chief and some documentary evidence not germane to the question before us. The parties were married in Decatur, Illinois on August 18, 1962, but have been residents of Missouri for more than the period prescribed by § 452.305(1), Laws 1973, p. 470, § 2. At the time of the marriage petitioner was 21 years of age and respondent, 22.

Petitioner's evidence was that his marriage, in his opinion, was irretrievably broken because there was no likelihood that his marriage could be preserved. The basis for his conclusion that the marriage was irretrievably broken was that for three years he has felt that he no longer loves his wife. They have been separated on two occasions; the first time, between October of 1972 to May of 1973, and again from October 1973, to the date of trial. It was he who left home on each occasion. They had undergone counseling prior to the first separation with the family physician, a psychiatrist, a priest, a minister, friends and family. He cannot continue married life with the respondent.

Petitioner admitted on cross-examination that during his periods of separation he had associated with women other than his wife and on one occasion had intercourse with one of the women. He admitted that when he returned home in May, 1973, he resumed marital relationships with respondent, and maintained the "husband-wife father-children" relationship until he left the marital home the last time in October, 1973.

Respondent testified that between 1973 and 1974 she and petitioner had "quarrels"[1] about normal husband and wife things— "No big thing." She was dissatisfied with petitioner's role as a husband around the home because he said he would do things and then he would not do them. She had

guests at the home when they could afford it, but they could not afford to have guests often. They had guests at home more frequently than once every three months. She never refused to have friends over to the house and was happy entertaining when they had the money, but they had financial troubles throughout their married life. Petitioner managed the money throughout the marriage and was still managing it. They made "ecology boxes" together with another couple about once a week. This was done at night after petitioner came home from work. Prior to their first separation petitioner had to be at work by 7:30 a. m. As a consequence they would retire between 10 and 12 p. m. On occasion, when she was sewing for the children and had a deadline to meet, he would retire before she did. They had some late night discussions over problems with the children, on normal husband and wife problems, and normal every day happenings. She did not feel that she had enough help with the children's disciplining because petitioner was at work so much of the time. He said that it was necessary that he be at work so much, and she accepted this.

About five years ago, for the first time, she realized something was wrong with the marriage but she did not know what it was. She concluded that the children and she were not as important to the petitioner as they had been. He did not want to be home. He had to attend dinner meetings and "things" with General Motors, his employer, and she was not included in these activities. He told her she was not welcome at these dinners. She became ill and lost 25 pounds. She went to her family physician who gave her all of the help he could. Petitioner came home one night from work and told her that some of the girls at work went to a psychiatrist for their problems, and suggested that she consult him. She did. After respondent saw the psychiatrist, he wanted to see the petitioner. Petitioner went to see the psychia-

---

1. "Quarrels" was the word used by petitioner's counsel in his question and adopted by respondent initially; however, throughout the greater part of her testimony she insisted the word "discussions" was more appropriate to these husband and wife conversations.

trist and respondent returned to his care also. After a time the psychiatrist told her he wanted to see the petitioner again, but petitioner would not go see him this time. The psychiatrist referred respondent to his brother who was a marriage counselor and both she and petitioner went to see the marriage counselor a number of times between May, 1972, and October, 1972. She talked with one priest initially when she began to suspect a problem with the marriage and then again on another occasion with another priest in Springfield, Illinois, to ascertain where she stood with her church. She also talked with a minister.

After petitioner returned to his familial role in May of 1973 he continued to remain away from home. He always had a dinner meeting, or a golf game, or another job. When he did come home it was late at night, or he only came home when it involved the children. He said, "he was going to try."

She believed the marriage could be preserved because petitioner had left before, returned and resumed marital relations with her and took up his place in the home. With respect to his sexual relations with the other woman, although she had heard about it, when she questioned petitioner, he told her that it was a rumor and untrue. She believed him until she heard him testify at the hearing; however, she believed he was just sowing some wild oats in that relationship.

His educational background is that he is three hours short of obtaining a college degree. In college he majored in economics. Respondent is a high school graduate, having taken a course "on the business line," including a high school bookkeeping course.

Petitioner's work background was that he was employed for the year prior to the hearing on his petition with a contracting company "in the sales aspect of selling home improvements and obtaining leads to do the same" on a commission basis. Prior to that he had been employed by the General Motors Parts Division for seven years.

He left that employment on a leave of absence because he was becoming dissatisfied with the job for the last three years of his employment there; his status with the company was remaining the same, and he saw no future. He left General Motors Parts Division "for personal reasons." Prior to that he had been employed by Chevrolet Motor Division for four years. While he was working for General Motors Parts Division he was also employed by a golf club on a part time basis as assistant manager for a period of two years working 30 to 35 hours per week during the summer and 5 to 8 hours per week during the winter.

Respondent, after graduating from high school, was employed by Sears-Roebuck in the credit office doing sales and billing. She terminated this employment in 1963 when she became pregnant with her daughter and has not been employed out of the home since then.

She testified that she does not read books or the newspapers, but she does "thumb through magazines." She plays no musical instruments. Her hobbies include the making of ecology boxes with her husband, as previously mentioned, working with ceramics and dough art. She is a voluntary physical education teacher at the school the children attend and she does share in the activities of the Campfire Girls in which her daughter participates. She makes most of her own clothing as well as that of the daughter; she makes some clothing for the son, but not much. Her recreation is enjoyed mostly with the children. She takes them to shows about once a month; bowling, probably less than once a month, when the children want to bowl; fishing; and ice-skating during the winter, about once a month, unless another mother takes the children.

Respondent has no special training other than that which she obtained in high school.

At the conclusion of the evidence respondent's counsel moved for a judgment in her behalf for the reason that the evidence failed to establish the basis for a dissolution of marriage under the provisions of § 452.-

320.2[2] because there was no evidence that respondent had committed adultery, that she has behaved in such a way that petitioner cannot be reasonably expected to live with her, that she had abandoned the petitioner, that they have lived separate and apart twelve months immediately before the filing of the petition, or that they have been separated twenty-four months immediately prior to the filing of the petition. A colloquy between the trial court and counsel ensued, in which the trial court advised counsel that having heard the parties and observed them, and giving due weight to their testimony, it thought that the marriage was irretrievably broken and there is no reasonable likelihood that it may be preserved. The trial court felt that the parties had made every effort to try to reconcile by going to counselors, a psychiatrist, and respondent to priests and ministers; that it was the clear intent of the Legislature in the enactment of the present Divorce and Marriage Act, which no longer contained the word "divorce," that where a situation has arisen, without trying to place fault on "A" or "B," the law recognizes that they cannot be forced to cohabit and live together. It was the trial court's opinion that if the parties demonstrate in their testimony that they are really irreconcilably situated at the time, the Legislature recognizes that fact. The inability of the trial court to make people happy in matrimony was decried and although the court could send them to marriage counselors and make them go through what they have already gone through, it saw no reason for doing so. The cause was then taken as heard and submitted. No request for findings of fact or conclusions of law was made by either party and none were made by the trial court. Shortly thereafter the decree of dissolution was entered.

Both parties are in agreement that one basis for the trial court's finding that the marriage was irretrievably broken in this contested case, is subparagraph 2(1)(b) of § 452.320, Laws 1973, p. 470, § 5, "[t]hat the *respondent* has behaved in such a way that the petitioner cannot reasonably be expected to live with the respondent." (Emphasis supplied). However, they do not agree on the requisite scope of the inquiry by the trial court in ascertaining whether the parties' marriage is irretrievably broken. Petitioner takes the position that the sole issue in this case is whether this marriage is irretrievably broken and if it is then the trial court did not err in granting the dissolution decree. Respondent, on the other hand, argues that in order for the trial court to make a finding that the marriage is irretrievably broken, where the respondent denies that it is, there must be substantial evidence of wrongdoing on the respondent's part so that the petitioner cannot reasonably be expected to live with her. She contends that there is no evidence in this record of any wrongdoing on her part and that the only evidence in the case for the petitioner's conclusion that the parties' marriage is irretrievably broken is his testimony that he no longer loves her.

The evidence petitioner contends supports the trial court's finding that the marriage is irretrievably broken is the following:

1) respondent recognized five years prior to the filing of his petition for dissolution of the marriage that there was something wrong with the marriage,

2) while petitioner was attending dinner meetings with General Motors, his employer, respondent was not included,

3) respondent did not read newspapers or books or attempt personal growth by belonging to a church, civic or women's group,

4) when petitioner returned home after a long day's work, respondent would bring up problems late at night,

5) the marriage relationship continued to deteriorate,

6) petitioner maintained a steady course of employment and supported the family while the respondent was confused and needed help,

7) to assist respondent, petitioner suggested psychiatric help and on advice of

2. All references to Ch. 452 RSMo are to Laws 1973, p. 470, § 5.

the psychiatrist undertook professional marriage counseling with respondent,

8) respondent sought other help, but despite all this the marriage did not improve and it continued to weaken and break apart until a separation followed between October, 1972, and May, 1973,

9) during the separation the petitioner occasionally dated and had one affair, and

10) after petitioner returned nothing changed and after six months petitioner realized that he could not continue to live with respondent.

■ So far as we have been able to ascertain, this is the second case in which this question has been presented to the appellate courts of Missouri since the adoption of the Divorce Reform Act passed by the 77th General Assembly in 1973.[3] There is today in Missouri one ground for the granting of a decree dissolving a marriage, and that is where the trial court finds that there remains no likelihood that the marriage can be preserved and therefore the marriage is irretrievably broken. § 452.305.1(2). While the thrust of the Divorce Reform Act is pointed towards marital breakdown and the elimination of the "fault concept" in the resolution of marital problems experienced by couples whose marriages are deteriorating, it is not a true "No Fault" form of legislation, as one may readily discern from a reading of the Act in its entirety.

Unlike other states[4] which have adopted the "no fault" concept of divorce reform laws the General Assembly of Missouri clearly did not enact a total "no fault" dissolution law. Rather, our General Assembly adopted a "modified no fault" dissolution law. In those jurisdictions where the true "no fault" dissolution law is in effect all that needs to be shown to authorize the entry of a decree of dissolution is that the marriage is "irretrievably broken." In most "no fault" laws the term "irretriev-

ably broken" is left undefined and no definitive standards or guidelines are given to control the dissolution process and consideration is given to each case individually. The key issue for the trial court's determination is whether there exists a reasonable possibility of reconciliation and the marriage as a whole is considered in making this determination. All that the trial court must find from the evidence presented at the hearing on the petition is that the parties can no longer live together because of difficulties so substantial that no reasonable efforts could reconcile them. *Flora v. Flora,* 337 N.E.2d 846 (CA Ind., 1975). Where the objects of the marital relationship are destroyed to such an extent that it seems improbable that the couple will again resume the relationship of husband and wife, in those states having a true "no fault" dissolution law, the marriage is irretrievably broken and this is a determination to be made under the particular statute by the trial judge on the basis of all of the facts and circumstances, and the factors underlying the determination made will necessarily vary in each case depending upon the mutual tolerance or lack of tolerance of the spouses. *In re Marriage of Franks,* 542 P.2d 845, 851[12] (Colo. banc 1975).

■ However, we conclude that in enacting the Divorce Reform Law of this State, the Missouri General Assembly had in mind the effect on society the breakdown in marriages has had and, unlike those jurisdictions where the legislatures have enacted true "no fault" dissolution laws, intended that a spouse, who by his or her actions makes the life of the other spouse intolerable or whose behavior makes it unreasonable for the marriage to be expected to continue, should not profit by his or her own wrongdoing and thereby obtain a dissolution of the marriage over the objection of the other perhaps innocent spouse. This intention is evidenced, we think, by the establishment of guidelines within the Law

---

**3.** The first case was *Nichols v. Nichols,* 538 S.W.2d 727 (Mo.App.1976).

**4.** Ariz.Rev.Stat. § 25–312 (1973 Supp.); Calif. Civ.Code § 4506 (1970); Fla.Stat. §§ 61.031,

61.044, 61.052 (1971); Iowa Code Ann. § 598.17 (1974–75 Supp.); Ky.Rev.Stat.Ann. §§ 403.110, 403.130, 403.140, 403.150, 403.170 (Laws 1972 S.B. 133); Wash.Rev.Code Ch. 26.09.

itself for trial courts of this State in two different situations. The first is where the marriage partners have stated under oath or affirmation that their marriage is irretrievably broken, or where one of the parties has so stated and the other has not denied it. That situation is governed by § 452.320.1. The other, is where the other partner has denied under oath or affirmation that the marriage is irretrievably broken, in which instance § 452.320.2 is applicable. It is this latter circumstance that we have here under consideration.

When one of the partners to the marriage has denied that the marriage is irretrievably broken the trial court is required to consider all relevant factors, including the circumstances that gave rise to the filing of the petition and the prospect of reconciliation, and, after hearing the evidence, make a finding whether or not the marriage is irretrievably broken. However, *"in order for the court to find that the marriage is irretrievably broken,* the petitioner shall satisfy the court of one or more of" five facts. (Emphasis supplied). Of these five facts which the petitioner must satisfy the trial court in order for it to find that the marriage is irretrievably broken, three are couched in terms which involve wrongdoing by the respondent which causes the trial court to find under subsection (a) that petitioner finds it "intolerable" to live with the respondent or, under subsection (b) that petitioner cannot "reasonably be expected to live with the respondent." The first wrongdoing which will support a finding under this guideline is adultery committed by the respondent; the second, that the respondent has behaved in such a way that the petitioner cannot reasonably be expected to live with the respondent; and the third, abandonment of the petitioner by the respondent for a continuous period of at least six months preceding the presentation of the petition.

Alternatively, in the absence of any "wrongdoing" on the part of the respondent, the trial court may then find the marriage is irretrievably broken if it is satisfied by petitioner's evidence (1) that the parties to the marriage have lived separate and apart *by mutual consent* for a continuous period of at least twelve months preceding the filing of the petition or (2) that they have lived separate and apart for a continuous period of at least twenty-four months preceding the filing of the petition.

■ The last time these parties separated was October 20, 1973. This petition for dissolution of marriage was filed on July 24, 1974. A period of nine months had intervened and there is no evidence that the respondent consented to the separation. Therefore, there is no evidence upon which the trial court could have based its finding of fact under § 452.320.2(1)(d) or (e) that the marriage is irretrievably broken.

Likewise, there is no evidence that the respondent has committed adultery, nor that she has abandoned petitioner for a continuous period of at least six months preceding the presentation of the petition.

The only remaining "fact" upon which the petitioner had the burden of satisfying the trial court that the marriage was irretrievably broken is that respondent has behaved in such a way that he cannot reasonably be expected to live with her. His sole reason for his inability to live with respondent was that he no longer loved her.[5] He specified no behavior on her part which caused him to arrive at this conclusion. He did relate their efforts at marriage counseling and his return to the home to see if the marriage could be revitalized, and then his subsequent leave-taking. That there was something wrong with the marriage was recognized by the respondent and she undertook to find out what it was. It was she who first undertook to discern what was at the base of their difficulties and went to her family physician. While the petitioner consulted with the psychiatrist on one occasion, he later refused to return when so requested. From this evidence we conclude

---

5. Even in those jurisdictions having true "no fault" dissolution the mere fact "I want out" is not recognized as a basis for dissolution. See:

*Ryan v. Ryan,* 277 So.2d 266, 271 (Fla.1973); *Flora v. Flora, supra.*

that it was the wife, rather than the husband, who undertook to preserve the marriage. It was he who advised her that she was not welcome at the dinners sponsored by his employer. All of the evidence is that here was a mother who was burdened alone with the child-rearing of the minor children of the family, whose discussions concerning the children were categorized by petitioner's counsel as "quarrels" when never once during petitioner's testimony did he complain that it was these "quarrels" or "discussions" which made it unreasonable to expect petitioner to live with the respondent. We find in the record no complaint from the petitioner that his wife's failure to read the newspapers or books was a behavior trait which contributed to the downfall of the marriage. Nor, are we impressed with petitioner's argument on appeal that respondent, after petitioner's return, failed to recognize that the manner in which the parties functioned would have to change in order for there to be a likelihood for the marriage to be preserved. We note that the evidence is clear that after petitioner returned he did not change; he continued attending his company dinners at which respondent was unwelcome. The behavior in this record which would make it unreasonable to expect one of the parties to live with the other is essentially petitioner's not respondent's.

This marriage may well be beyond saving, and in holding as we do that there is not sufficient evidence in this record to support the finding of the trial court that this marriage is irretrievably broken within the terms of § 452.320.2(1) we are but delaying the inevitable; nevertheless, we as an appellate court, construe and apply the law, we do not make it. It is commonly recognized that the Divorce Reform Act of

this State is not, and was not meant to be, a true "no fault" dissolution law.[6] This case is one of those which does not fit in the category of those cases under § 452.320.1 which are more closely akin to the "no fault" concept.[7]

We hold that under the evidence in the record before us the trial court erred in finding that the marriage of these parties was irretrievably broken where the respondent denied that it was in accordance with the provisions of § 452.320.2(1)(a) through (d) and reverse the decree of dissolution entered thereon.[8]

WEIER, P. J., and McMILLIAN, J., concur.

---

**6.** See: Dissolution of Marriage Under Missouri's New Divorce Law, 29 J.Mo.Bar 495 (1973).

**7.** For other cases see Anno. Validity, construction and effect of "No Fault" divorce statute providing for dissolution of marriage upon finding that relationship is no longer viable. 55 A.L.R.3d 581.

**8.** Petitioner filed a Motion to Affirm Judgment requesting this court to affirm the judgment of

the trial court on the ground that as of October 20, 1975, the parties lived separate and apart for twenty-four months and therefore were he to file a new suit for dissolution of the marriage the provisions of § 452.320.2(1) (e) would be satisfied requiring the trial court to grant the decree of dissolution. That motion has been denied.