**Catherine E. WELSH, Petitioner/Cross–Appellant,**

v.

**Albert Dave WELSH, Respondent/Appellant.**

**No. 63592, 63678.**

Missouri Court of Appeals, Eastern District, Division Two.

Jan. 25, 1994.

Greensfelder, Hemker & Gale, P.C., Roger Edgar, St. Louis, for appellant.

Patrick Winning & Associates, Janis B. Powell, St. Louis, for respondent.

KAROHL, Judge.

Husband appeals the entry of a decree of dissolution and alternatively claims error in the division, valuation and characterization of certain marital property. Wife cross-appeals claiming error in the classification and distribution of certain property and in the amount of maintenance awarded her. We affirm as modified.

The parties were married on June 21, 1975. They have no children together, but each has three children from prior marriages, all of whom are now adults. Wife filed a petition for dissolution of marriage on September 18, 1989. The hearing was held in September, 1992. The trial court dissolved the marriage and disposed of the property by decree entered on February 2, 1993. We review the issues under *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will not reverse the decree as long as there is substantial evidence to support it even if a different conclusion could have been reached.

In his first point, husband contends the trial court erred in granting a decree of dissolution. He denied wife's allegation that there was no reasonable likelihood the marriage of the parties could be preserved and, therefore, that the marriage was irretrievably broken. He testified he did not want a decree of dissolution and was willing to attempt counseling. On appeal, he maintains wife failed to meet her burden of demonstrating the breakdown. We disagree.

Missouri has adopted a modified no-fault dissolution law rather than a true no-fault dissolution law. *In re Marriage of Mitchell*, 545 S.W.2d 313, 318 (Mo.App.1976). When one party denies under oath or affirmation that the marriage is irretrievably broken, § 452.320.2 RSMo 1986 provides that "the

court shall consider all relevant factors, including the circumstances that gave rise to the filing of the petition and the prospect of reconciliation." If the court makes a finding whether or not the marriage is irretrievably broken, it will be based on the petitioner having demonstrated one or more of the following facts:

(a) That the respondent has committed adultery and the petitioner finds it intolerable to live with the respondent;

(b) That the respondent has behaved in such a way that the petitioner cannot reasonably be expected to live with the respondent;

(c) That the respondent has abandoned the petitioner for a continuous period of at least six months preceding the presentation of the petition;

(d) That the parties to the marriage have lived separate and apart by mutual consent for a continuous period of twelve months immediately preceding the filing of the petition;

(e) That the parties to the marriage have lived separate and apart for a continuous period of at least twenty-four months preceding the filing of the petition.

Section 452.320.2(1) RSMo 1986. Wife concedes she may rely only on (b) because none of the other categories apply to the facts. Therefore, the trial court's finding that the marriage between the parties cannot be preserved and that the marriage is irretrievably broken depends solely on whether wife demonstrated that husband behaved in such a way that she could not reasonably be expected to live with him.

Husband cites several cases in support of his argument beginning with *In re Marriage of Mitchell,* 545 S.W.2d 313, 318 (Mo.App. 1976). In *Mitchell,* husband filed the dissolution petition and wife denied his allegation of irretrievable breakdown. The court stated husband's "sole reason for his inability to live with respondent was that he no longer loved her." *Id.* at 319. In reversing the decree of dissolution, this court noted the "behavior in this record which would make it unreasonable to expect one of the parties to live with the other is essentially petitioner's not respondent's." *Id.* at 320. *Mitchell* was written shortly after the Divorce Reform Law was enacted. We analyzed the new statute, noting the decline of the "fault concept" and the exception to "no fault" situations. We concluded that the legislature "intended that a spouse, who by his or her actions makes the life of the other spouse intolerable or whose behavior makes it unreasonable for the marriage to be expected to continue, should not profit by his or her own wrongdoing and thereby obtain a dissolution of the marriage over the objection of the other perhaps innocent spouse." *In re Marriage of Mitchell,* 545 S.W.2d 313, 318 (Mo.App.1976).

Wife's claim of irretrievable breakdown, in the present case, does not depend on any misconduct on her part. She attributes the breakdown to a pattern of behavior on the part of husband. She testified to specific misconduct to document the conclusion that husband was not compassionate or considerate. She testified husband, on May 12, 1989, backed a van down their driveway, struck and knocked her down, and ran over her. He reversed direction and ran over her a second time. He knew she was on the driveway and intended to go to the mailbox at the end of the driveway. Although she characterized the event as an "accident," she did not rule out the possibility her husband intended to hurt her. In her view, only husband knew what he intended. Wife adopted the date of that event as the date of separation after a fourteen year marriage. She testified she was physically and emotionally wounded.

Wife's other evidence of husband's conduct which the court could consider as a basis for concluding it would be unreasonable to expect wife to live with husband included: (a) husband falsely accused wife of causing an employee to leave the Welsh Company which concluded with husband saying to wife, "You are nothing. You do nothing."; (b) husband embarrassed wife in public with anti-Semitic comments; (c) husband left wife for a business trip after she was injured by his operation of the van; and, (d) husband intentionally hit golf balls at wife across the backyard of the home. Wife offered to describe further examples of similar conduct.

In general, husband denied any misconduct. He pointed to the fact the parties stayed in the same house for a year after the petition was filed and continued to appear together socially. He did not testify they lived together as husband and wife. To the extent there was a conflict in the evidence, the issue of irretrievable breakdown was for the court. There was substantial evidence to support a finding that husband behaved in such a way that wife could not reasonably be expected to continue to live with him as spouse.

Two other cases relied upon by husband are *In re Marriage of Capstick,* 547 S.W.2d 522, 523 (Mo.App.1977) and *In re Marriage of Dillon,* 559 S.W.2d 81 (Mo.App.1977). In both, the dissolution decree granted by the trial court was reversed for want of substantial evidence of irretrievable breakdown of the marriage. In both cases petitioner completely failed to meet the burden of proving misbehavior of spouse. In *Dillon,* the total evidence on the issue was petitioner's feeling "certain differences" had arisen and her feeling that the marriage could no longer be preserved. In *Capstick,* wife opined the marriage was irretrievably broken and could not be saved. No evidence of conduct or misconduct was presented.

Another dissolution decree was reversed and remanded where husband denied wife's allegation the marriage was irretrievably broken, and the only evidence introduced by wife was an affirmation of her petition allegation that there has been "certain irreconcilable differences, frictions, and interferences, and harassments, arguments, and quarreling, [and] bickering." *In re Marriage of Williams,* 593 S.W.2d 648, 650 (Mo.App. 1980). There was no substantial evidence in the record to satisfy the trial court of one or more of the factors listed in § 452.320.-2(1)(a)–(e). *Id.* Mere conclusions, unsupported by facts, are insufficient. In *Nieters v. Nieters,* 815 S.W.2d 124 (Mo.App.1991), we reversed a dissolution of marriage decree where husband filed for dissolution and wife denied the marriage was irretrievably broken. We held husband's testimony that there were "several occasions where we just could not get along" and that "it got some-what violent on both parts" over the last three or four years did not provide substantial evidence the marriage was irretrievably broken. Relying on *Mitchell,* we reversed because there was no evidence to satisfy the trial court of misbehavior of spouse as set forth in § 452.320.2(1)(b).

Cases where dissolution decrees have been reversed after one party's denial of irretrievable breakdown and the other party's failure to carry his or her burden of proof demonstrate that this is a fact-sensitive area. In *Cregan v. Clark,* 658 S.W.2d 924 (Mo.App. 1983), a judgment decreeing legal separation was affirmed based on husband's testimony that wife "liked to be extravagant. She was to a certain degree incommunicative. We just did not have any—could not have rational discussions on an adult level. She alienated me from the children. She was subject to extremely irrational behavior." *Id.* at 927. Husband gave examples, and the Western District expressly deferred to the trial court on whether the behavior ascribed to the respondent was egregious enough to say that husband could not reasonably be expected to live with her. *Id.* at 927–928. We now do the same. Husband's first point is denied.

Husband next contends the trial court erred in its division of the marital property in five ways. We will address each contention in sequence. First, husband alleges the decree failed to satisfy the court's expressly stated objective of dividing marital property into approximately equal shares in that the decree's requirement that husband give wife a note for $1,000,000 as part of her marital property results in wife being given twice the amount required to effect an equal division of the marital property. In other words, after dividing the marital assets, wife had approximately $1,000,000 less than husband, according to the values assigned to the various items, and the trial court ordered him to give her a note for $1,000,000 to equalize the distribution. A promissory note for $500,000 was the amount required to equalize the division of marital property.

In her brief, wife states she "agrees that based on the values of the marital assets as set forth in the Court's Findings of Fact that there is indeed a computational error. The

promissory note would be $499,963.14 if the values set forth by the trial court are sustained." However, she disagrees with some of the values assigned to certain assets, and argues further that husband defrauded her by depleting certain marital assets. We will address those points separately. The trial court expressly stated its purpose was to equalize marital assets by requiring husband to execute the $1,000,000 note to wife. But a note of that amount will not accomplish that result. Wife agrees. After taking into account other adjustments to the values of marital property addressed in this opinion, the appropriate face amount of the note will be determined by dividing the difference between the parties' assets by two.

■ Husband's second complaint about the distribution of marital assets is that the decree's allocation of the Demarlo Farm to husband at a value of $745,000 ignores the fact that part of the farm, valued at $394,850, was found by the court to be husband's premarital, separate property and was treated as such by other provisions of the decree. Wife does not dispute that the total value of the farm was $745,000. Rather, she argues the entire farm was properly characterized as marital. She contends the trial court erred in characterizing any of the farm as husband's separate property.

The trial court awarded a percentage of the farm to husband as separate property based on the ratio 991.49 pre-marriage acres to 1862.89 total acres, multiplied by a total value of $745,000. There were houses on the farm, one was an A–Frame, but they were not separately valued by evidence offered by either party. Clearly, the inconsistency of awarding a sizable percentage of the value of the farm to husband as separate property and then charging the entire value of the farm to husband as marital property indicates the trial court made a mistake. We also conclude that the trial court intended to award 991.49 acres out of 1862.89 acres valued at $394,850 to husband as separate property, and therefore erred in computing by not subtracting $394,850 from $745,000 in valuing the portion of the farm distributed to husband as his marital property. We will examine whether wife's off-setting argument

that the award of part of the farm as husband's separate property was in error before considering whether the miscalculation was prejudicial.

Wife does not dispute that husband owned 991.49 acres of the farm before the marriage. Therefore, because there was no proof that marital assets, including labor, have contributed to some enhanced value of the premarital land, and in the absence of any evidence of value of the land at the time the parties married, we will not disturb the trial court's award of $394,850 worth of the farm to husband as separate property. Section 452.330.2(5) RSMo Cum.Supp.1988, *Schneider v. Schneider*, 824 S.W.2d 942, 946 (Mo. App.1992). Thus, the value attributed to the marital portion of the farm awarded to husband must be modified to $350,150 for purposes of calculating the note from husband to wife to equalize the distribution.

■ Husband's third contention is related to the second. He argues the decree added to husband's marital share, the A–Frame house on the Demarlo Farm valued at $60,000, which value was already included in the value of the farm, thereby duplicating or counting a portion of the same property twice. We find the evidence is that the $745,000 value placed on the farm is inclusive of the improvements to the farm, and excludes only the equipment and livestock which were separately valued and awarded. We find no evidence in the record concerning a separate value of the A–Frame house, even though husband states that it could be sold separately. Therefore, the evidence only supports a finding the A–Frame awarded to husband as his share of marital property is a duplication of property already awarded him, partially as separate and partially as marital, and the $60,000 value attributed to the A–Frame should be deleted from the award of husband's share of the marital property before calculating the division of marital assets into equal values.

■ Husband's fourth complaint about the distribution of marital assets is that the decree valued at their full face value certain assets allocated to husband's marital share without reduction or adjustment even though

there were liens in favor of third parties against such assets. Marital property which the trial court believed had a value of $1,763,-344 was awarded to husband (which we now recognize must be reduced by $394,850 and $60,000 to account for a mathematical error and duplication), but no recognition was given to evidence that the property was subject to liens to secure indebtedness exceeding $1,839,000. These liens were created when husband used his assets to serve as additional collateral for bank loans to the Welsh Company.

Accordingly, the debts are those of the Welsh Company, one-third of which is owned by husband and was awarded to him as his separate property. As long as there is evidence the company is able to meet its obligations, the value of the assets awarded to husband and used by him as additional collateral for loans to Welsh Company will be unaffected. Husband's own expert testified the company, even in liquidation, would be able to pay all its debts with the exception of two notes payable to husband. Those notes are the subject of a later point. In other words, according to husband's own evidence, the marital assets awarded to husband that are pledged as security on loans to the Welsh Company, including a $100,000 certificate of deposit and the Demarlo Farm, need not be diminished in value by reason of debt.

Husband's relies on *Oldfield v. Oldfield,* 666 S.W.2d 17, 19 (Mo.App.1984) for the proposition that the trial court must consider encumbrances on specific assets in determining their value. Virtually all the marital assets awarded husband are subject to liens in favor of commercial lenders who had loaned money to the Welsh Company. He is a personal guarantor on those debts. As in *Oldfield,* though, "husband apparently fails to distinguish between an encumbrance, which imposes a lien upon the asset, and a general obligation." *Id.* The existence of a general obligation can affect the overall net value of the marital estate, but does not alter the valuation of a specific asset. *Id.* On appeal after remand, in *Oldfield v. Oldfield,* 688 S.W.2d 778, 781 (Mo.App.1985), this court noted that the existence and extent of debts, and who will be responsible for their pay-

ment, are factors to be considered by the trial court in establishing a fair division of marital assets. This does not apply to the debts in the present case because, as noted, the debts are associated only with husband's separate property, namely, the Welsh Company and there is evidence to support a finding it has the ability to pay them off.

■ In his last claim of error regarding the distribution of marital property, husband argues the decree failed to credit wife's share of the marital property with a $22,005 income tax refund received by wife and allotted to her by a pretrial order which also required that such amount be charged against wife's share of the marital property. In an order dated June 3, 1991, an income tax refund check in the amount of $44,010 was to be distributed as follows: "[one-half] thereof, or $22,005, to petitioner as a credit to her share of marital property. The remaining [one-half] or $22,005 shall be credited to respondent's share of the marital property ..." The order distributes husband's share to pay wife's attorney's fees. Husband omits any complaint about the trial court's failure to charge his share of the income tax refund check to his share of the marital property. The trial court's omission of the $22,005 share of the income tax refund from both parties' marital assets does not require a change because the division of property was, or will be, approximately equal and the two amounts would offset each other. Point denied.

Husband's final point is the trial. court erred in treating the "Daniel Hall Note" as marital property because it was husband's separate property in that the note was given to husband in exchange for farm property which husband owned prior to marriage and which he sold to Hall after marriage. The flaw in husband's argument, however, is that husband has already been awarded one hundred percent of the farm acreage he owned prior to the marriage. He does not argue that any of the farm acreage acquired after marriage is his separate property. Husband's evidence is that he owned 991.49 acres of land known as Demarlo Farm in Alabama before marriage, and purchased 871.4 additional acres thereafter. In the decree of

dissolution, he was awarded 991.49 acres as separate property. Even if we were to find that this note was in fact received in exchange for separate property and remained such under *Salisbury v. Salisbury,* 643 S.W.2d 821 (Mo.App.1982), we would need to determine how many acres were sold to Hall and reduce husband's separate property award accordingly. The record is not developed enough to permit this. Point denied.

■ Wife's first point on her cross-appeal is the trial court erred in the valuation of two promissory notes from the Welsh Company to husband because there was no evidence before the trial court that the notes were worthless as of the date of the hearing. Promissory notes from the Welsh Company to husband for the monies lent to the Welsh Company by husband during the course of the marriage had a face value of $2,497,-190.79. Wife's expert testified the notes were worth their full face value. He used both the book value method and liquidation method to value the Welsh Company. He considered financial statement figures from June 27, 1991. Husband's expert disagreed, stating that in his opinion the fair market value of the notes was $69,675. He testified the company had experienced substantial losses in the last four years, over $5,000,000. His method for determining the fair market value of the notes was based on liquidating the business. In the event of liquidation there would be $69,675 left to pay on the notes. He did not have an opinion as to the value of the notes if the company continues to remain in business. Hence, both experts agreed the notes were not valueless.

The trial court awarded the Welsh Company notes to husband as his share of marital property, assigning them a value of zero. However, the trial court awarded to husband as separate property all the shares of stock in the Welsh Company and gave those shares a value of $69,675, remarking that the value of the Welsh Company notes held by husband were included. Husband testified approximately $600,000 was owed before marriage. The legal effect of that evidence was not considered by the trial court and is not argued here.

Given the testimony of husband's expert, $69,675 was available to apply on the debts evidenced by the notes which would render the value of the stock as zero because noteholders are paid before shareholders. The award of $69,675 must be attributed to the notes which are marital property, and not the stocks, which are husband's separate property. Thus, using the trial court's valuation finding, we modify the value assigned the notes for purposes of division of marital assets from zero to $69,675. The value assigned the stock for purposes of division of separate property is not pertinent to this appeal.

■ Wife's second contention is the trial court erred in determining that certain assets were marital rather than separate. Specifically, she contends she brought $35,000 into the marriage from the proceeds of the sale of her former home, she had $27,000 in certificates of deposit from prior to her marriage, and she inherited $10,000 from her father. She argues that the sum of $72,000 should have been set aside as her separate property.

Wife's evidence in support of her claim of separate property is as follows:

[WIFE'S ATTORNEY]: Mrs. Welsh, when you married Mr. Welsh, did you have any savings accounts or CDs that you brought with you into the marriage?

[WIFE]: Yes, I did.

Q: And approximately how much money did you bring into the marriage and put into a savings account or a CD?

A: Well, as far as I can determine because a lot of those records I started at the bank that's changed [sic] and so forth; but I found one around $27,000, and—

Q: Okay. Was that in addition to the $35,000 that you lent to your husband for you to live on?

A: Right. Right.

Q: So you've got $27,000 and you've got $35,000?

A: Right.

Q: Now, did you inherit any money from any people, or did you have a bequest in any will after that?

A: $10,000 from my father.

Q: And so that's another $10,000 that you would consider your property?

A: Right, uh-huh.

     \*      \*      \*      \*      \*      \*

Q: And where is that $35,000 now?

A: Well, I put it into a CD.

Q: Okay. And is the entire 35—Is the entire $35,000 intact?

A: Yes.

Q: Okay.

A: Yes.

Q: And the $10,000 that you inherited from your father,—

A: Uh-huh.

Q: —what did you do with that money?

A: I invested that in CDs, also.

Q: Okay. So that is also intact?

A: Right. And then I had other CDs when I came into the marriage that I had accrued.

Husband supports wife's contention that she lent him $35,000 and he paid her back. However, neither party offered evidence tying any of the funds described by wife to a bank account or certificate of deposit in her name, or any evidence of an account approximating any of the sums she described. Even if we assume arguendo wife met her burden of proving pre-marriage ownership or inheritance, she did not establish that the funds still exist, much less that she maintained the funds in separate names. *Weast v. Weast,* 655 S.W.2d 752, 755 (Mo.App.1983). No funds in separate accounts were awarded to wife in the decree. In light of wife's failure to trace the funds she claims to be her separate property to an existing source, we cannot say that the trial court abused its discretion in not setting aside $72,000 as wife's separate property. *Dardick v. Dardick,* 670 S.W.2d 865, 869 (Mo. banc 1984). Point denied.

In her third point, wife argues the trial court erred in making the determination that the marital property should be divided equally since due consideration was not given to husband's conduct. This allegation is plainly refuted by the record.

■ The division of marital property is governed by section 452.330 RSMo Cum. Supp.1991, which requires a fair and equitable division of the marital property. In this case, the trial court determined fair and equitable to mean equal. It stated, "In arriving at the division of marital property, the Court has taken into consideration the conduct of the parties during the marriage, the economic circumstances of each of the parties, and the Court has intended to set off the marital property into approximately equal shares, given the nature of the assets of the parties." The trial court expressly noted it considered husband's conduct in making its discretionary decision concerning the division of marital property. We will interfere with the trial court's considerable discretion in dividing marital property only if the division is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion. *In re Marriage of Stuart,* 805 S.W.2d 309, 312 (Mo.App.1991). An equal division of property pursuant to a statutory requirement that the division be equitable is not required, but equality in apportionment is certainly not an abuse of discretion.

■ In her brief, wife accuses husband of methodically draining the marital assets and refers to husband physically assaulting her with his van. Both matters were for the trial court. She also cites *Eagleton v. Eagleton,* 767 S.W.2d 582, 586 (Mo.App.1988) in support of her argument that the case must be remanded for the trial court to make a finding on the specific factual issue as to whether husband defrauded the marital estate of substantial funds. *Eagleton* does not require such remand for a factual finding where wife never suggested husband defrauded the marital estate except to insert a paragraph to that effect in her proposed findings of fact and conclusions of law. Point denied.

■ In her final point, wife contends the trial court erred in the amount of the maintenance award made to her in that it is insufficient to meet her needs and husband has the ability to pay. She was awarded $1500 per month as periodic, modifiable maintenance. She argues, "The record clearly indicated that her expenses each month totalled

$3915." Actually, the only evidence concerning wife's expenses in the record on appeal is her testimony that her total monthly expenses are $3915. She did not supply this court with the statement of income and expenses submitted to the trial court. There is nothing in the record on appeal indicating the amount of wife's monthly income. Wife did not meet her burden of establishing the trial court abused its discretion in determining the award of maintenance. *Franke v. Franke,* 747 S.W.2d 202, 203 (Mo.App.1988). Point denied.

We affirm the trial court's order granting dissolution of marriage effective February 2, 1993, with the following modifications: (1) The value of the portion of Demarlo Farms awarded to husband as marital property is $350,150, inclusive of the A–Frame house, instead of $745,000 and $60,000; (2) The value of the Welsh Company notes awarded to husband is $69,675, instead of zero; and, (3) Before the note from husband to wife to equalize the division of assets, the total value of husband's marital property is $1,378,169, and the total value of wife's marital property is $763,417, leaving a difference of $614,752. Accordingly, the appropriate face amount of the note from husband to wife is $307,376, leaving both parties with $1,070,793. In all other respects, the decree of dissolution is affirmed.

Decree of dissolution is affirmed as modified.

CRANE, P.J., concurs.

CRAHAN, J., dissents in separate opinion.

CRAHAN, Judge, dissenting.

Although I would otherwise concur in the majority's thorough and well-reasoned analysis of the property division and maintenance issues, I must respectfully dissent from the court's holding that the record supports the trial court's determination that the marriage is irretrievably broken.

1. All further statutory references are to RSMo 1986 unless otherwise indicated.

2. Wife provided very few dates or even approximate time frames for most of the incidents re-

As the majority recognizes, the Missouri Legislature has not seen fit to adopt a "no-fault" dissolution law. Op. at 803; *In re Marriage of Mitchell,* 545 S.W.2d 313, 318 (Mo.App.1976). Rather, where the respondent denies under oath or affirmation that the marriage is irretrievably broken, the petitioner has the obligation of proving one or more of the circumstances set forth in § 452.320.2(1) RSMo 1986.[1] In this case, Wife concedes that the only statutory circumstance potentially applicable under the evidence adduced at trial is § 452.320.2(1)(b): "That the respondent has behaved in such a way that the petitioner cannot reasonably be expected to live with the respondent." Wife offered the following as specific instances[2] of conduct allegedly rendering it unreasonable for her to be expected to live with Husband:

1. *The Van Incident:* Even viewing the facts of the van incident in light of all of the inferences accorded in the majority opinion, the fact remains that Wife clearly and unequivocally stated that the entire matter was indeed an accident:

*Cross Examination*

Q: Throughout the course of your testimony and in response to your lawyer's questions, you refer to the incident of May 12, 1989, as an accident.

A: That's correct.

Q: It was an accident; wasn't it?

A: As far as I know, it was an accident.

Q: So you're not suggesting for a moment that Mr. Welsh intentionally tried to harm you in any way, shape or form; are you?

A: No. I have never said that.

Q: And you're not saying that today?

A: No.

*Redirect Examination*

Q: ... Are you testifying that the event was not necessarily intentional but you simply don't know?

counted in her testimony, although it is clear from the context of her testimony that a number of them occurred several years prior to filing.

A: I have never said it was intentional.

Q: But you do not know whether it was intentional?

A: Only Dave knows what he did,—

Q: Okay.

A: —and I would never question him.

Q: But are you testifying—

. . . .

A: I said only Dave knows that. I would never know. I don't think any of us know, and that—that wasn't my basic problem.[3]

Wife conceded that Husband had immediately stopped the van upon realizing what had happened, summoned emergency medical care, and remained with her in the emergency room. When it was clear that Wife was not in danger and would be released shortly, Husband proceeded with a scheduled business trip to the Orient after arranging for a relative to take Wife home.

2. *The Bagel and Cream Cheese Incident:* Shortly after Husband's return from his trip, Wife asked Husband to go to the grocery store to pick up several items. He forgot the bagels and cream cheese Wife asked him to get and unkindly remarked that Wife should get them herself.

3. *Wife Catches Husband's Cold:* Husband refused to go to the doctor when he had a cold and Wife later manifested the same cold symptoms.

4. *Keeping Tennis Engagement When Wife Had A Fever:* On one occasion, Husband proceeded to meet a friend for a tennis engagement when Wife had a fever.

5. *Husband's Flying:* Wife did not like to fly with Husband when he piloted the company plane and on one occasion flew back on a commercial flight rather than accompany him. Husband ceased flying several years prior to trial.

6. *Golf Ball Chipping:* Wife was forced to move her chaise lounge to avoid being struck by golf balls when Husband practiced chipping in their back yard. On another occasion, a ball actually struck Wife but caused no injury.

7. *Tennis Injury:* Several years prior to filing, Husband and Wife collided while playing tennis, injuring Wife.

8. *Insult to Friend:* Husband made a boorish and anti-Semitic remark about the size of a mutual friend's nose, causing embarrassment to Wife.

9. *Child's Wedding Arrangements:* Wife was resentful about arrangements for the wedding when Husband's last child was married.

10. *Criticism Pertaining To Business Matters:* Back in 1981 or 1982, Husband harshly criticized Wife for what he apparently perceived as meddling in personnel matters at his business.

Aside from the van incident, which Wife conceded to be an accident, it is unlikely that close scrutiny of even the best of marriages of any substantial duration would fail to disclose incidents of similar character. In my view, such incidents, either individually or collectively, are insufficient to support a determination that it would be unreasonable for Wife to continue living with Husband. Indeed, Wife continued to do so and attended social occasions with Husband for at least a year after the latest of the incidents described above. They continued to use their condominium at the Lake of the Ozarks together and to attend performances at the Muny Opera.

In *Nieters v. Nieters,* 815 S.W.2d 124, 126 (Mo.App.1991) we held that vague, but potentially more serious testimony that "it got

---

3. The majority seizes on this passage of Wife's redirect examination for the proposition that Wife "did not rule out the possibility that Husband intended to hurt her." Given the nature of the questions, it is difficult to imagine how Wife's responses could truthfully have been anything other than what they were. In the face of her unequivocal testimony that she did not contend the incident was anything other than an accident, this testimony surely cannot serve as evidence to support a determination that the incident was intentional. Moreover, in view of Wife's testimony that Husband's intent or lack thereof was "not my basic problem," the van incident cannot possibly serve as evidentiary support for a determination that Husband's behavior made it unreasonable for Husband and Wife to continue to live together.

somewhat violent on both parts," that husband and wife could not get along on several occasions, and that there were differences about the raising of the parties' children was insufficient to support the required findings under § 452.320.2. Although testimony here is somewhat more specific, aside from the admittedly accidental van incident the specifics themselves, although clearly not ideal, are essentially commonplace. By holding that a marriage can be deemed irretrievably broken on the basis of the incidents set forth above, it is truly a misnomer to characterize Missouri's statutory scheme as anything other than "no-fault".

I fully recognize the apparent futility of reversing the judgment of the trial court in view of the fact that the time consumed by the trial and appeal would presumably be sufficient to enable Wife to refile immediately and satisfy one of the other grounds specified in § 452.320.2(1). *See, e.g.,* § 452.320.-2(1)(e) RSMo 1986. But such considerations alone cannot justify departure from statutory mandates. As we observed in *Nieters:*

> This marriage may well be beyond saving, and in holding as we do that there is not sufficient evidence in this record to support the finding of the trial court that this marriage is irretrievably broken within the terms of § 452.320.2(1) we are but delaying the inevitable; nevertheless, we as an appellate court, construe and apply the law, we do not make it.

*Nieters,* 815 S.W.2d at 127 (quoting *In re Marriage of Mitchell,* 545 S.W.2d 313 (Mo. App.1976)).

As the court did in *Nieters,* I do not hesitate to acknowledge that strict adherence to the statutory requirements may well be a futile exercise in many if not most instances. Nevertheless, by its enactment of § 452.320.-2(1), our Legislature has unmistakably decreed that marriage contracts should be far more difficult to terminate than commercial transactions. When the allegation that the marriage is irretrievably broken is contested, the petitioner must either prove (a) that the respondent committed adultery and that the petitioner finds it intolerable to live with the respondent; (b) behavior by the respondent

sufficient to render it unreasonable for petitioner and respondent to live together; (c) abandonment of the petitioner for at least 6 months prior to filing; (d) consensual separation for at least 12 months prior to filing; or (e) separation for at least 24 months prior to filing. § 452.320.2(1)(a)–(e).

If ground (b) can be established by relatively commonplace incidents of inconsiderate behavior, there would have been no reason for the Legislature to have included grounds (c) through (e). Further, if evidence of the respondent's adultery is insufficient without additional evidence that the petitioner (subjectively) finds it "intolerable" to live with the respondent, surely a determination that the respondent's conduct renders it (objectively) unreasonable for petitioner and respondent to live together would require a showing of conduct at least as repugnant to the marital relationship as adultery. Thus, the Legislature must have contemplated a showing of conduct well beyond the normal range of behavior incident to the marital relationship.

Beyond question, a good number of the incidents recounted in this case could properly be characterized as inconsiderate, petty or even boorish. But they do not rise to the level of cruelty, abuse, adultery, lack of support or other behavior which would be commonly acknowledged as rendering it unreasonable for the parties to continue to live together. Nor does it appear that Wife viewed the incidents that way, at least when they occurred. Wife continued to live, socialize and travel with Husband for about a year after the most recent incident described in her testimony and apparently made only halfhearted, if any, attempts to air and settle her grievances.

Under such circumstances, the Legislature has provided a means for obtaining a dissolution, but only after a two year period. Section 452.320.2(1)(e). Such delay is presumably intended to provide time for reflection on the wisdom of terminating the relationship and to permit attempts at reconciliation if the parties are so inclined. *See also* § 452.320.2(2).[4] The wisdom and practicality

---

4. Wife testified that it was Husband's lack of     compassion and kindness toward her that were

of such a scheme is not an issue for this court.[5] Our role is to enforce the law in accordance with the legislative intent whenever possible. By accepting the relatively minor and commonplace grievances put forth by Wife in this case as grounds for dissolution of marriage, the majority thwarts the legislative intent as recognized and confirmed in *Nieters* and *Mitchell* and effectively transforms the dissolution statutes into a pure "no fault" scheme.

For the foregoing reasons, I would reverse the judgment of the trial court and deny the relief requested in the petition.

really the crux of the problem and that if Husband had even once said "I'm sorry," she would have felt better. Although the behavior and attitudes recounted in the testimony are strongly indicative of a marriage that is in need of help, by opposing the dissolution and specifically requesting an attempt at reconciliation, Husband appears to be willing to address the problems.

5. Some might argue that requiring parties to prove fault before a neutral factfinder may itself solidify attitudes that will not only preclude reconciliation but also prolong recriminations and bad feelings after the dissolution is granted. Such considerations are properly aired and resolved in the Legislature and not in this court. Once the Legislature has made its determination, as it has in § 452.320.2(1), our role is to enforce it.